SYLVIA SMITH BOWMAN *vs.* DAVID HELLER.[1]

Suffolk. January 10, 1995. - June 13, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Libel and Slander. Constitutional Law,* Freedom of speech and press, Libel and slander, Labor, Union. *Labor,* Union election. *Emotional Distress.*

A candidate for office in a union of State employees was clearly not a public figure in the context of her tort claims against a coworker for intentional or reckless infliction of emotional distress [522-523], nor was the candidate a limited purpose public figure, where the union election did not involve a public controversy [523-526]: the imposition of tort liability in the circumstances did not implicate the protections of the First Amendment to the Constitution of the United States. NOLAN, J., dissenting, with whom LYNCH, J., joined.

The provisions of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411 (2), were not applicable and did not preempt State tort claims where the record of the tort actions did not support any claim that the terms of a labor contract were involved. [526-527] NOLAN, J., dissenting, with whom LYNCH, J., joined.

Where a civil defendant's statements were, by his own admission, not intended to influence a union election, the imposition of tort liability for his malicious or reckless infliction of emotional distress did not chill constitutional rights of free speech. [527] NOLAN, J., dissenting, with whom LYNCH, J., joined.

CIVIL ACTION commenced in the Superior Court Department on June 6, 1990.

The case was heard by *J. Harold Flannery,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

[1]Pursuant to a settlement agreement, claims originally filed by the plaintiff against the Commissioner of Public Welfare and three individual defendants, not including the defendant, were dismissed on December 18, 1991.

*Alan M. Dershowitz* (*Michael R. Schneider* with him) for the defendant.

*Nancy S. Shilepsky* (*Maria R. Durant* with her) for the plaintiff.

The following submitted briefs for amici curiae:

*Robert S. Mantell & Kevin G. Powers* for Massachusetts Chapter of the National Employment Lawyers Association.

*Lynn Hecht Schafran & Deborah Ellis,* of New York, *Sydelle Pittas, Carolyn Burt, Amy Drachman & Gretchen Kendall,* for Women's Bar Association.

*Mary L. Bonauto* for Gay & Lesbian Advocates & Defenders.

*Ozell Hudson, Jr., Barbara J. Dougan, Louis A. Rodriques & Priscilla E. Johnson,* for Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association & others.

*Ann M. Kappler & Jodie L. Kelley,* of the District of Columbia, for Feminists for Free Expression.

*Laura R. Handman, William S. Adams & Edward J. Davis,* of New York, for National Writers Union & others.

*George E. O'Brien* for Hotel Employees/Restaurant Employees International Union Local 26.

ABRAMS, J. The defendant, appealing from a judgment that was based in part on his intentional or reckless infliction of emotional distress on the plaintiff, seeks refuge in the fact that at the time of his wrongdoing the plaintiff was a candidate for election to the office of president of their union local. From this, the defendant argues that the First Amendment to the United States Constitution protects him from liability in the absence of proof of actual malice. The defendant's claim fails from its inception because the activity on which liability was based was, on the defendant's own admission, not intended to influence the union election. The Supreme Court has distinguished plaintiffs' claims for defamation or intentional infliction of emotional distress on the basis of the plaintiffs' prominence with regard to *public controversies* relevant to their causes of action. See *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 342 (1974). Because there was no evi-

dence of a public controversy, the plaintiff was neither a public figure nor a limited purpose public figure.

After the election, the plaintiff sought recovery on four related claims: one count of intentional infliction of emotional distress; one count of reckless infliction of emotional distress;[2] and two claims under the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, § 11I (1992 ed.).[3] After a jury-waived trial, judgment was entered in favor of the plaintiff, and damages were awarded in the amount of $35,000. The trial judge ruled that "any one of the plaintiff's claims . . . [was] a sufficient basis" for the $35,000 judgment, but refused to award "duplicative" damages. The defendant appeals. We transferred the case to this court on our own motion. We conclude that the judgment based on the tort claim of intentional or reckless infliction of emotional distress should be affirmed.[4]

I. *Facts.* At the time of the incident which gave rise to this litigation, the plaintiff, Sylvia Smith Bowman, was a sixty year old supervisor in the Worcester office of the Department of Public Welfare (department). She began working as a social worker for the department in 1967, and was a longstanding and active member of Local 509 of the Service

[2]The elements of a cause of action for reckless infliction of emotional distress are the same as those for intentional infliction of emotional distress. Thus, our discussion of the latter applies equally to the former cause of action.

[3]The plaintiff alleged that the defendant's actions violated her right to run for union office and her right to be free from sexual harassment. General Laws c. 12, § 11I (1992 ed.), provides in relevant part: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in [ §] 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages . . . ."

[4]The defendant also claimed that the evidence was insufficient to support the judgment in the plaintiff's favor under the MCRA. The distribution of the two photocopies did not constitute a threat, intimidation, or coercion as defined by the MCRA. We vacate the judgment to the extent that it is based on any violation of the MCRA.

Employees International Union (union). In the 1987 union election, the plaintiff challenged the incumbent president of the local chapter of the union.

In October, 1987, while the plaintiff was on an approved leave to campaign in the union election, the defendant, David Heller, an employee in the plaintiff's office who supported the incumbent president, created two distinct photocopied representations of the plaintiff by superimposing a photograph of her face and name on two different photographs of women striking lewd or masturbatory poses. The photograph of the plaintiff's face was taken from a campaign card she had distributed to union members. The photographs on which the defendant superimposed the plaintiff's face were taken by the defendant from pornographic magazines. In one of the photographs, the model is nude from the waist down, except for garters, and is posed toward the camera with her legs wide apart as she holds a banana next to her exposed breast. In the other photograph, the model is entirely naked, and appears to be engaged in masturbation. The representations were crafted by the defendant during regular office hours and reproduced on photocopiers owned by the department. The defendant then distributed his handiwork to five coworkers in the Worcester office. Subsequently, the representations were reproduced by employees other than the defendant and distributed to a wider office audience.

The trial judge credited the defendant's claim that, in distributing the caricatures, "it was not his intent to sway votes or to induce people not to vote for [the plaintiff]," and that he sought to make the plaintiff "look ridiculous." The trial judge also credited Heller's statement that he wanted "[t]o make sure they wouldn't be seen by [the plaintiff]," because they were "a private satire among a select group of friends."

When the plaintiff returned to the office from her campaign leave in November, 1987, she learned of the sexually explicit nature of the photocopies and their distribution throughout the office. The defendant made various allegations that the plaintiff harbored a desire for revenge, and

that she made various crude references to men in general and the defendant in particular.

The trial judge found that once the plaintiff saw the pictures she was "shocked" and experienced severe stress, crediting her testimony that she felt "degraded, publicly humiliated, and vulnerable upon seeing the photocopies; [and that] she also felt that the matter was too serious for her to remain silent." The judge also credited the testimony of an expert who explained the sequelae associated with posttraumatic stress disorder (PTSD) and opined that the plaintiff suffered from PTSD and that the trauma of being represented in the workplace in the compromising caricatures created by a coworker was the cause. According to the record, the plaintiff had to undergo, and still is undergoing, psychological therapy for PTSD. The trauma of the event had a negative impact on her ability to function as productively as she had for many years at her job.[5] The judge found that this trauma was unrelated to the plaintiff's loss in the union election.

As a result of her distress about the photocopies, the plaintiff filed formal complaints with department administrators and the union. The department officials determined that the defendant's conduct was sexually harassing, reprimanded the defendant, and explained to the plaintiff that "the production and limited distribution of sexually explicit material by [the defendant] which contained a reproduction of your facial features . . . subjected [you] to highly improper and unacceptable behavior which constituted sexual harassment." The union trial board concluded that the defendant's conduct was unbecoming to a union member. The union's determination resulted in a public apology by the defendant to the plaintiff.

Subsequently, the plaintiff filed her tort claims, and amended her complaint to add her statutory claims. The defendant filed counterclaims alleging the plaintiff had defamed him. The trial judge allowed the plaintiff's motion for summary judgment on the defendant's counterclaims. The

[5]Pursuant to the settlement agreement between the plaintiff and the department, the plaintiff no longer works for the department.

defendant did not appeal the disposition of his counterclaims. Those claims are not before us.[6]

II. *The plaintiff is neither a public figure nor a limited purpose public figure.* The trial judge ruled that the plaintiff was a public figure because she voluntarily became involved in the local union election. See *Hustler Magazine, Inc.* v. *Falwell,* 486 U.S. 46 (1988). Whether the plaintiff is a public figure is a question of law. See *Wolston* v. *Reader's Digest Ass'n,* 443 U.S. 157, 165-169 (1979); *Materia* v. *Huff,* 394 Mass. 328, 331 (1985). The Supreme Court has said that an individual plaintiff's status is context-dependent and thus determined "by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the [tort liability]." *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 352 (1974). "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of [her] life." *Id.* The fame required for an individual to be a public figure for all purposes, as opposed to a limited purpose public figure, is very great; the individual must be a "household name" on a national scale. *Tavoulareas* v. *Piro,* 817 F.2d 762, 772 (D.C. Cir.), cert. denied, 484 U.S. 870 (1987) (although plaintiff was "highly prominent individual, especially in business cir-

---

[6]The defendant does not challenge the trial judge's findings of fact or the sufficiency of the evidence on the elements of the torts of intentional and reckless infliction of emotional distress. See *Boyle* v. *Wenk,* 378 Mass. 592 (1979); *Agis* v. *Howard Johnson Co.,* 371 Mass. 140, 144-145 (1976). The judge found that the defendant's actions in creating and distributing the photocopies at work were extreme and outrageous, e.g., outside all reasonable bounds of civilized society, were aimed intentionally at causing, and actually did cause, the plaintiff severe emotional harm. We review the judge's findings of fact to determine whether they are clearly erroneous. See *Powers* v. *Freetown-Lakeville Regional Sch. Dist. Comm.,* 392 Mass. 656, 659 (1984); *Marlow* v. *New Bedford,* 369 Mass. 501, 508 (1976). See also Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). Conclusions of law are not set aside by a reviewing court unless inconsistent with applicable law. See *Powers, supra; Marlow, supra.* We conclude that there is neither error of fact nor a mistake of law in the trial judge's findings and order on these tort claims.

cles," he was not a general purpose public figure for "all aspects" of his life where his "celebrity in society at large [did] not approach that of a well-known athlete or entertainer — apparently the archetypes of the general purpose public figure"). The plaintiff clearly is not a general purpose public figure.

The Federal Courts of Appeal have developed various tests to aid judges in applying the two-prong limited purpose public figure standard set forth in *Gertz*.[7] See, e.g., *Clyburn* v. *News World Communications, Inc.*, 903 F.2d 29, 31 (D.C.Cir. 1990) (applying test for limited purpose public figure first set forth in *Waldbaum* v. *Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-1298 [D.C. Cir.], cert. denied, 449 U.S. 898 [1980]: "[1] that there have been a public controversy; [2] that the plaintiff have played a sufficiently central role in the controversy; and [3] that the alleged defamatory statement have been germane to the plaintiff's participation in the controversy");[8] *Silvester* v. *American Broadcasting Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988) (adopting *Waldbaum* three-part limited purpose public figure test); *Lerman* v. *Flynt Distrib. Co.*, 745 F.2d 123, 136-137 (2d Cir. 1984), cert. denied, 471 U.S. 1054 (1985) (requiring a defendant to show that the plaintiff has: "[1] successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; [2] voluntarily injected himself into a public controversy related to the subject of the litigation; [3] assumed a position of prominence in the public controversy; and [4] maintained regular and continuing access to the media"); *Contemporary Mission, Inc.* v. *New York Times Co.*, 842 F.2d 612, 617 (2d

---

[7]*Gertz* established the two-pronged analysis to determine if an individual is a limited public figure. First, a "public controversy" must exist. *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Second, "the nature and extent of the individual's participation in the particular controversy" must be ascertained. *Clark* v. *American Broadcasting Co.*, 684 F.2d 1208, 1218 (6th Cir. 1982), cert. denied, 460 U.S. 1040 (1983).

[8]On the view we take of the issues, we need not decide if the defendant's cartoons were germane to the plaintiff's participation in the union election.

Cir.), cert. denied sub nom. *O'Reilly* v. *New York Times Co.*, 488 U.S. 856 (1988); *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 590 (1st Cir. 1980) ("first task" is to determine "the sort of public controversy referred to in *Gertz*"). Courts must determine if there is a public controversy because of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it should include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964).

Because most cases involve media defendants reporting on controversies of interest to the public, the courts have had little difficulty in recognizing public controversies in most of the limited purpose public figure cases, and thus they have ruled that the plaintiffs had limited purpose public status. Of course, media attention does not alone transform a private controversy into a public one, *Time, Inc.* v. *Firestone*, 424 U.S. 448 (1976), and the attention that a defendant's alleged wrong itself generates does not create a public controversy necessary for limited purpose public figure status. See *Hutchinson* v. *Proxmire*, 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure").

The defendant does not claim that the election contest received any public attention. There was no basis for concluding the result of the election contest would be felt by persons who were not participants in the union election. The election in this case had no more public controversy than the usual election of a president of a social club or an election to the governing board of an educational institution, to the directorship of a corporation, or to the governing body of a condominium association (see, e.g., *Sewell* v. *Eubanks*, 181 Ga. App. 545, 546 [1987]).

The fact that the controversy was a union election does not provide an automatic basis for deciding for First Amendment

purposes that there was a public controversy.[9] The defendant makes no claim that Federal statutory or regulatory law preempts State tort law when a union election is involved. See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin*, 418 U.S. 264, 273 (1974); *Linn* v. *United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 65 (1966); 29 U.S.C. § 413 (1988). If all candidates for office in a union, particularly a union of State employees, are to be treated automatically as limited purpose public figures, the standard that courts have been following in determining that status will have to be abandoned. In sum, the plaintiff was not a limited purpose public figure because the circumstances did not involve a public controversy.[10]

Even if the election had received some public attention, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston* v. *Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979). "It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'. . . In contrast, speech on matters of purely private concern is of less First Amendment concern." (Citations omitted.) *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759 (1985). In *Dun & Bradstreet*, the Supreme Court followed the stan-

---

[9]The defendant does not argue that there was an issue of public concern in the union election. We have not found any case other than *Materia* v. *Huff*, 394 Mass. 328 (1985), in which the mere fact of involvement in a local union election was sufficient to establish the limited purpose public figure status of an otherwise private individual. See generally Annot., Who is a "Public Figure" for Purposes of Defamation Action, 19 A.L.R.5th 1 (1994). The cases cited in the dissent all have public aspects which are not present in this case.

[10]The defendant phrases his defense to the plaintiff's claim under the "First and Fourteenth Amendments to the United States Constitution and in arts. 9, 16, and 19 of the Massachusetts Declaration of Rights." We reject the defendant's argument that art. 9, as interpreted in *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83 (1983), provides him broader protection than the First Amendment in these circumstances. On the facts before us, we decline to extend the protection of arts. 9, 16, and 19 to the circumstances of this case.

dard for determining whether an issue was of public concern
set forth in *Connick* v. *Myers*, 461 U.S. 138, 147-148 (1983)
("Whether . . . speech addresses a matter of public concern
must be determined by the [expression's] content, form, and
context . . . as revealed by the whole record"), holding that
a credit report was not of public concern. In addition, the
Court noted that the report was available confidentially to
only five subscribers and thus the information was not vital
to "the free flow of commercial information." *Dun & Brad-*
*street, supra* at 762. Thus, the Court concluded that no "spe-
cial protection" was required for the credit reports "to ensure
that 'debate on public issues [will] be uninhibited, robust,
and wide-open.' " *Id.*[11] The imposition of tort liability in cir-
cumstances where the record does not disclose a public con-
troversy is not prohibited.

The defendant argues that the Labor-Management Re-
porting and Disclosure Act, 29 U.S.C. § 411 (2), provides
the defendant, as a union member, with "extraordinarily
broad freedoms." We believe that the defendant mistakenly
relies on decisions under the National Labor Relations Act,
such as *Marshall* v. *Local Union No. 815, United Textile*
*Workers*, 479 F. Supp. 613 (E.D. Tenn. 1979); and *Rollison*
v. *Hotel, Motel, Restaurant, & Constr. Camp Employees,*
*Local 879*, 677 F.2d 741 (9th Cir. 1982). The defendant
does not argue that the statute is applicable. If the statute is
not applicable, "[t]he test for preemption of a tort claim is
whether the [S]tate 'confers nonnegotiable [S]tate-law rights
on employers or employees independent of any right estab-

---

[11]Earlier decisions had left open the question of the constitutional signif-
icance of speech about purely private issues. See, e.g., *Monitor Patriot Co.*
v. *Roy*, 401 U.S. 265, 275 (1971) (in context of political campaigns, ques-
tion left open "whether there remains some exiguous area of defamation
against which a candidate may have full recourse" for reputational dam-
age); *Time, Inc.* v. *Hill*, 385 U.S. 374, 391 (1967) (because "[d]ifferent
considerations might arise concerning the degree of 'waiver' of the protec-
tion the State might afford" under a privacy statute, Court left open "the
question whether the same [First Amendment] standard should be applica-
ble both to persons voluntarily and involuntarily thrust into the public
limelight").

lished by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.' " *Young* v. *Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 999 (9th Cir. 1987), quoting *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 213 (1985). On this record, there is no union contract involved. The defendant does not assert that the plaintiff's tort claims are "inextricably intertwined with the terms of the labor contract." *Id.* The record does not support any such claim.

III. *Conclusion.* We conclude that the defendant's speech was not entitled to constitutional protection because there was no public controversy. Further, because the defendant did not intend to influence the union election, the imposition of liability for the defendant's speech does not chill constitutional rights of free speech.

*Judgment affirmed.*


NOLAN, J. (dissenting, with whom Lynch, J., joins). I disagree with the court's holding that the plaintiff was not a limited purpose public figure because the union election was not a public controversy. I conclude that the plaintiff became a limited purpose public figure when she voluntarily thrust herself into the election campaign. I also conclude that the caricatures at issue addressed the plaintiff's campaign for the presidency, despite their horrid content. As a result, I would use the "actual malice" standard of liability in determining whether the plaintiff should recover on her claim of intentional infliction of emotional distress.[1] *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988). Thus, because the plaintiff has failed to prove that the caricatures contained a false statement of fact, I dissent.

---

[1]Under the actual malice standard, the plaintiff must prove that the speech was false and that the speaker either had knowledge of the falsity or had acted with reckless disregard of the truth. See *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988).

In reviewing the trial judge's finding of liability on the plaintiff's claim of intentional infliction of emotional distress, we must "make an independent examination of the whole record" in order to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 285 (1964). Having reviewed the entire record, I am compelled to disagree with the court's conclusion that the plaintiff was not a limited purpose public figure. This court decided precisely this issue in *Materia* v. *Huff*, 394 Mass. 328 (1985), where we held that the plaintiff was a limited purpose public figure as a matter of law because he "voluntarily thrust himself into the controversy by campaigning for reelection to the position of secretary-treasurer of Local 526." *Id.* at 331. Nevertheless, today the court decides that an election campaign for the presidency of a union local is not a public controversy. In support of this decision the court states that "[t]here was no basis for concluding [that] the result of the election contest would be felt by persons who were not participants in the union election." *Ante* at 524. The court continues in this vein stating that "[t]he election in this case had no more public controversy than the usual election of a president of a social club or an election to the governing board of an educational institution, to the directorship of a corporation, or to the governing body of a condominium association." *Ante* at 524.

These conclusions are in reference to the first prong of the three-part test for determining whether an individual is a limited purpose public figure, set forth in *Waldbaum* v. *Fairchild Publications, Inc.*, 627 F.2d 1287, 1297-1298 (D.C. Cir.), cert. denied, 449 U.S. 898 (1980). The first prong, which addresses the issue whether there is a public controversy, requires the reviewing court to "ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." (Footnote omitted.) *Id.* at 1297.

In my opinion, an election is the absolute paradigm of a public controversy. The "immediate participants" in this union election campaign, the candidates, would not have been the only persons to have felt the impact of the election. Instead, the election would have had an effect on each of the 8,700 members of Local 509.[2] In addition, the Supreme Court of the United States has stated repeatedly that the public has an interest in labor unions in general and in union elections in particular. See *Wirtz* v. *Local Union No. 125, Laborers' Int'l Union of N. Am.*, 389 U.S. 477, 483 (1968) (noting that the public has an interest in labor union elections); *Wirtz* v. *Local 153, Glass Bottle Blowers Ass'n of the U.S. & Can.*, 389 U.S. 463, 475 (1968) (stating that "Congress [has] emphatically asserted a vital public interest in assuring free and democratic union elections"); *Thornhill* v. *Alabama*, 310 U.S. 88, 102-103 (1940) (stating that labor relations are not matters of mere local or private concern). See also *National Ass'n of Gov't Employees* v. *National Fed'n of Fed. Employees*, 844 F.2d 216, 220 (5th Cir. 1988) (indicating that the labor union election campaigns are a matter of public concern). Based on this authority, I conclude that the election campaign for the presidency of Local 509 was a public controversy.[3] The plaintiff, therefore, be-

---

[2] I also think that the court has failed to consider the increased level of public interest that is implicated in this case where many members of Local 509 were State workers who were employed by the Department of Welfare. As employees of the State, their salaries were paid with State tax dollars. The court's comparison, therefore, between a union election and an election in a social club or the governing body of a condominium association is particularly ill conceived in this case. Both a social club and a condominium association are purely private organizations created to protect the private entertainment or the private property interests of their members.

[3] If, however, the election was not a public controversy in relation to the public at large, it was certainly a public controversy in relation to the members of Local 509. See *Materia* v. *Huff, supra* at 331 (stating that "the plaintiff's status as a public figure is determined in relation to those [union] members, rather than to the community at large"); *Walko* v. *Kean College of N.J.*, 235 N.J. Super. 139, 152 (1988) (deciding that a college administrator was a public figure within the college community). Indeed, the plaintiff had communicated directly with many of the members of Lo-

came a limited purpose public figure when she voluntarily thrust herself into the election campaign for the presidency of Local 509.[4] See *Materia* v. *Huff, supra* at 331. See also *Jean* v. *Dugan,* 20 F.3d 255, 262 n.7 (7th Cir. 1994).

Speech concerning a limited purpose public figure will qualify for the actual malice standard set forth in *New York Times Co.* v. *Sullivan, supra* at 279-280, only if that speech addresses the public controversy into which the limited purpose public figure has voluntarily injected herself. See *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 351 (1974). See also *Waldbaum* v. *Fairchild Publications, Inc.,* 627 F.2d 1287, 1298 (D.C. Cir. 1980), (stating that the alleged defamation must have been "germane" to the limited purpose public figure's participation in the controversy). If, however, the con-

---

cal 509 while campaigning for the presidency. In 1987, the plaintiff spent a total of forty-five days visiting most of the four hundred union work sites throughout the State. She also mailed thousands of campaign postcards to the homes of members of Local 509. Thus, it is clear that the plaintiff enjoyed broad access to channels of communication in her effort to generate support for her campaign. See *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 345 (1974) (stating that a plaintiff's access to channels of effective communication is an important consideration in determining whether he is a public figure).

[4]Many other courts have concluded that union officers are limited public figures. See *Miller* v. *Transamerican Press, Inc.,* 621 F.2d 721, 724 (5th Cir.), *S.C.,* 628 F.2d 932 (5th Cir. 1980), cert. denied, 450 U.S. 1041 (1981) (deciding that high ranking official of Teamsters union was a limited public figure); *Guam Fed'n of Teachers, Local 1581* v. *Ysrael,* 492 F.2d 438, 439 (9th Cir.), cert. denied, 419 U.S. 872 (1974) (noting that officers of a teachers' union were public figures); *Henry* v. *National Ass'n of Air Traffic Specialists,* 836 F. Supp. 1204, 1206 n.3, 1211 n.6 (D. Md. 1993), aff'd without opinion, 34 F.3d 1066 (4th Cir. 1994) (stating that elected union leaders of 1,700-member union were public figures); *Batson* v. *Shiflett,* 325 Md. 684, 722, 728 (1992) (plaintiff who was elected president of union local was a public figure); *Miles* v. *Perry,* 11 Conn. App. 584, 592 n.7 (1987) (noting that union officers are generally considered public figures for purposes of union business); *Lins* v. *Evening News Ass'n,* 129 Mich. App. 419, 432 (1983) (deciding that union officers were limited public figures); *City Firefighters Union, Local 28* v. *Duci,* 104 Misc. 2d 498, 503 n.7 (N.Y. 1976) (concluding that union officers are public figures). See also *Hanlon* v. *Davis,* 76 Md. App. 339, 357 (1988) (noting that trial court judge instructed jury that president of union was a public figure).

tested speech does not address the controversy into which the limited purpose public figure has thrust herself, then the States may impose liability "on a less demanding showing than that required by *New York Times Co.* [v. *Sullivan*]," as long as they do not impose liability without fault. *Gertz* v. *Robert Welch, Inc., supra* at 347-348. "Whether . . . speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick* v. *Myers,* 461 U.S. 138, 147-148 (1983). After reviewing the entire record and considering the content, form, and context of the caricatures, I am compelled to conclude that the speech in this case addressed a matter of public concern — the plaintiff's candidacy for the presidency of Local 509.[5] See *Connick* v. *Myers, supra* at 147-148. Although I find the content of the caricatures to be totally repulsive, even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." *Linn* v. *United Plant Guard Workers of Am., Local 114,* 383 U.S. 53, 63 (1966). As a result, liability for intentional infliction of emotional distress should be imposed on the defendant only if the plaintiff can prove by clear and convincing evidence that the caricatures contained a false statement of fact and that the defendant had knowl-

---

[5]The court has placed great emphasis on what it terms as "the defendant's own admission [that he did not intend] to influence the union election." *Ante* at 518. In my opinion, the defendant has done no such thing. He testified that he "was trying to state that [the plaintiff's] statements during the campaign were ridiculous." The defendant stated also that the caricatures "were the most absurd pictures that I could think of, and [the plaintiff's] views were the most absurd I could think of." In addition, the defendant stated that "[t]he picture was not to be of any sexual nature, except of [the plaintiff] as a political candidate. I wanted to kind of degrade her as a political candidate, but that's it." Furthermore, the defendant testified that he was not attempting to discourage people from voting for the plaintiff simply because he believed that they already had decided not to vote for her. Finally, both the plaintiff and other union members recognized that the caricatures were related to the union election. Thus, it is clear to me that the defendant intended to lampoon the plaintiff's candidacy with his caricatures.

edge of the falsity or had acted with reckless disregard of the truth. See *Hustler Magazine, Inc.* v. *Falwell, supra* at 56.

Even if the plaintiff was a private figure, despite her entering the election campaign for the presidency of Local 509, the actual malice standard remains the appropriate standard to use in this case. See *Batson* v. *Shiflett,* 325 Md. 684, 728 (1992); *McKinnon* v. *Smith,* 52 Misc. 2d 349, 352 (N.Y. 1966). The Supreme Court of the United States has used the actual malice standard in free speech cases involving unions because "federal policies favor[ ] uninhibited, robust, and wide-open debate in labor disputes." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 273 (1974) (*Letter Carriers*). The Supreme Court has recognized that "exaggerated rhetoric was commonplace in labor disputes and protected by federal law." *Id.* at 286. Therefore, in order to avoid "unwarranted intrusion upon free discussion" in labor disputes, the Court adopted by analogy the actual malice standard used in *New York Times Co.* v. *Sullivan, supra* at 279-280. *Linn* v. *United Plant Guard Workers, supra* at 65. As a result, the Supreme Court held that Federal labor policy preempts State libel actions for defamatory statements, made in the course of a labor dispute, which were published without knowledge of their falsity or with reckless disregard for the truth. See *id.* Subsequently, in *Letter Carriers,* the Supreme Court rejected the argument that the actual malice standard applied only in the context of a labor-management dispute or a representation campaign. See *Letter Carriers, supra* at 278-279.[6] Instead, the Supreme Court reasoned that "application [of the actual malice standard] of *Linn* [v. *United Plant Guard Workers*] must turn on whether the defamatory publication is made in a context

---

[6]Although the labor-management relations system in *Letter Carriers* was established by an Executive Order and not the National Labor Relations Act (NLRA), the Supreme Court dismissed the distinction stating that, "the same federal policies favoring uninhibited, robust, and wide-open debate in labor disputes are applicable" in both cases. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 277 (1974).

where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Letter Carriers, supra* at 279.

In the present case, the Labor Management Reporting and Disclosure Act (LMRDA) is the relevant federal law because the controversy arose in the context of union officer elections.[7] See *Petersen* v. *Dole,* 956 F.2d 1219, 1223 (D.C. Cir. 1992); 29 U.S.C. § 481 (1988). "[T]he [LMRDA's] overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Finnegan* v. *Leu,* 456 U.S. 431, 441 (1982). Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership." *United Steelworkers of Am.* v. *Sadlowski,* 457 U.S. 102, 112 (1982). Thus, a claim for intentional infliction of emotional distress, in the context of a union election, implicates the same federal labor policies leading to the protection of freedom of speech as in *Linn* v. *United Plant Guard Workers, supra* at 65, and *Letter Carriers, supra* at 279. See *Henry* v. *National Ass'n of Air Traffic Specialists,* 836 F. Supp. 1204, 1211 (D. Md. 1993), aff'd without opinion, 34 F.3d 1066 (4th Cir. 1994); *Ross* v. *Duke,* 116 Ariz. 298, 300-301 (1977).

---

[7]The LMRDA governs, inter alia, "mixed" labor unions. See *Celli* v. *Shoell,* 40 F.3d 324, 327 (10th Cir. 1994). A "mixed" union has members that are working for private employers and members that are working for either the Federal government or the State. *Id.* In the present case, the plaintiff and defendant were both members of Local 509 of the Service Employees International Union. The local was comprised of both State workers and workers in private agencies. In addition, the local was part of the "Alliance," which was the "recognized bargaining agent" for the local. Thus, it is likely that the Local 509 is subject to the LMRDA, despite the paucity of clarity in the record.

By imposing an outrageousness standard on union election speech, today's decision will permit a candidate for a union office to seek damages for emotional distress from fellow union members who "say naughty things during [election campaigns]." *Linn* v. *United Plant Guard Workers, supra* at 67 (Black, J., dissenting). The Supreme Court has recognized the dangerously chilling effect of such a standard on free speech stating that " '[o]utrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An 'outrageousness' standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience." *Hustler Magazine, Inc.* v. *Falwell, supra* at 55. It is unavoidable, therefore, that the court's imposition of an outrageousness standard will chill protected speech in the context of a union election. See L. Tribe, American Constitutional Law § 13-26, at 1131-1132 (1988). Thus, to provide "adequate 'breathing space' to the freedoms protected by the First Amendment," the actual malice standard is the appropriate standard to use in the context of a union election. *Hustler Magazine, Inc.* v. *Falwell, supra* at 56. See *Beruan* v. *French*, 56 Cal. App. 3d 825, 828-829 (1976) (stating that labor union operates like a system of government and strong policies favor the full exercise of the right to free speech in union election campaigns).

Where the actual malice standard applies, the "*sine qua non* of recovery . . . is the existence of falsehood." *Letter Carriers, supra* at 283. In the present case, the plaintiff has not proved that the caricatures contained a false statement of fact. Accordingly, I dissent.[8]

---

[8]Because I agree with the court's decision to vacate the judgment on the plaintiff's two civil rights claims, *ante* at 519, I would reverse the entire judgment, in favor of the defendant.