USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1893 No. 94-1895 DORIS FREDETTE and PAUL FREDETTE, Plaintiffs, Appellees, v. ALLIED VAN LINES, INC., and TRANSIT HOMES OF AMERICA, INC., Defendants, Appellants. ____________________ No. 94-1894 DORIS FREDETTE and PAUL FREDETTE, Plaintiffs, Appellants, v. ALLIED VAN LINES, INC., MULLEN BROS., INC. of NORTH ADAMS, and TRANSIT HOMES OF AMERICA, INC., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ ____________________ Before Boudin, Circuit Judge, _____________ Coffin, Senior Circuit Judge, _____________________ and Stahl, Circuit Judge. _____________ ____________________ Joseph B. Bertrand with whom Marie G. Leary and Martin Magnuson ___________________ _______________ _______________ McCarthy & Kenney were on briefs for defendant Allied Van Lines, Inc. _________________ and defendant Mullen Bros., Inc. of North Adams. William Gordon Prescott with whom David W. Murphy, Jr., and Katz, _______________________ _____________________ ____ Lapointe & Murphy, P.C. were on brief for defendant Transit Homes of ________________________ America, Inc. David R. Cianflone with whom Cianflone & Cianflone, P.C. was on ___________________ _____________________________ briefs for plaintiffs. ____________________ September 28, 1995 ____________________ BOUDIN, Circuit Judge. We have before us cross-appeals _____________ in a case concerning long-distance moving arrangements that went seriously awry. The plaintiffs in the district court were Paul and Doris Fredette; the defendants were Allied Van Lines, Inc., ("Allied"), Mullen Brothers, Inc. of North Adams ("Mullen Brothers") and Transit Homes of America, Inc. ("Transit"). The facts, taken in the light most favorable to the jury verdict, Borden v. Paul Revere Life Ins. Co., 935 ______ __________________________ F.2d 370, 379 (1st Cir. 1991), are as follows. In September 1990, General Electric Company ("GE") laid off Paul Fredette, who was then working as a machinist in its Pittsfield, Massachusetts, plant. GE offered Paul Fredette a position in its Hickory, North Carolina plant, and he accepted. The Fredettes contacted defendant Mullen Brothers to arrange the move of their mobile home to North Carolina. Mullen is a local Massachusetts mover licensed only for intrastate moves; for interstate moves like the Fredettes', Mullen acts as an agent for Allied. In January 1991, a Mullen sales representative, Chad Lindburg, came to the Fredettes' Pittsfield home to inspect and inventory their mobile home and personal belongings. The mobile home was a one-bedroom unit with an attached porch and canopy and a detached shed. The Fredettes explained to Lindburg that they wanted to move the home and all of its contents and that they wanted to be fully insured. After -3- -3- that meeting, the Fredettes left for North Carolina and stayed with relatives while Paul Fredette began work at the GE plant there. They also purchased a lot for the home. In mid-February, the Fredettes returned and signed an agreement with Lindburg committing Allied to move the mobile home and its contents at a cost of $20,520; the Fredettes handed over a check, apparently believing that this amount represented all payments required for the move. Allied planned to transport the household possessions itself. It subcontracted the move of the mobile home to Transit and hired another company to move the porch and shed. According to the contract, the move was to begin on February 16, 1991, with a guaranteed delivery date no later than February 25, 1991. Transit, in turn, hired James Bedford to move the mobile home and he inspected it on the day that the contract was signed. The Fredettes then returned to North Carolina. On February 21, 1991, Lindburg told them that Bedford had discovered pre-existing structural damage after he moved the home off its Pittsfield lot. Bedford told Transit that the home was not roadworthy because it was sagging on its axles. Transit told Bedford not to move the home and told Allied that the home would not be moved until the Fredettes furnished Transit with a broad liability release. The Fredettes' personal belongings were placed in storage. -4- -4- The Fredettes returned to Pittsfield, photographed the home and hired their own expert, Stanley Bator, who determined that the home could be safely moved if a fourth axle were added. The Fredettes refused to sign the broad release demanded by Transit, but on March 1, 1991, Doris Fredette signed a promissory note to Allied for up to $2,500 to cover costs of adding an axle. A fourth axle was added, and on March 7, 1991, Bedford moved the home from Pittsfield, arriving in North Carolina on March 12. On arrival, the Fredettes and an expert they hired found (and photographed) substantial damage to the interior and exterior of the home. Bedford refused to place the mobile home on the lot until the Fredettes removed a fence and made other adjustments. The Fredettes hired Irvin Finger, who did the required work, but Bedford still refused to move the home onto the lot, saying that the ground was too hilly and muddy to do it safely. After consulting with Allied and Transit, Bedford left the mobile home near the lot and returned to Massachusetts. The Fredettes hired a local company which promptly placed the home onto the lot for an additional fee. A week later, after a number of requests by the Fredettes, Allied sent a crew to block and level the home. The contents of the home and the porch, including the front steps, had not yet arrived. Apparently Allied and the Fredettes were engaged in a dispute about the storage fees -5- -5- incurred during the moving delay, and Allied refused to deliver the personal belongings until the storage fee was paid. Delivery occurred on April 11, 1991, and the Fredettes moved into their home the next day, 45 days after the original guaranteed delivery date. While the home was en route, Paul Fredette became depressed and, as a result, was terminated from his job with GE. His anxiety and depression continued after the move and were confirmed by medical testimony at trial. He returned to work in May of 1991, but left again in September, again because of depression. Doris Fredette also suffered emotional distress. Ultimately, the Fredettes brought suit in Massachusetts state court, alleging a number of claims against Allied, Transit and Mullen. The defendants removed the suit to federal district court, and ultimately the parties went to trial on four counts: count I alleged a violation of the Carmack Amendment, 49 U.S.C. 11707; count II charged breach of contract; count IV alleged a violation of Massachusetts consumer protection law, Mass. Gen. L. ch. 93A, based on the intentional infliction of emotional distress; and count V charged intentional infliction of emotional distress.1  ____________________ 1Count III, a state-law claim for property damage, was dismissed as preempted by the Carmack Amendment. -6- -6- Counts I, II and V were tried to a jury beginning April 11, 1994; Count IV, the 93A claim, was heard by the court afterward. After the Fredettes rested, the district court dismissed Mullen as a party. On April 14, 1994, the jury found for the Fredettes and against Allied on the breach of contract claim and the claim of intentional infliction of emotional distress. It found for the Fredettes and against Transit on the Carmack Amendment claim and the claim of intentional infliction of emotional distress. The jury awarded $36,000, representing $18,500 on the Carmack Amendment claim against Transit; $7,500 on the contract claim against Allied; and $5,000 each against these defendants on the emotional distress claim. The district court then found in favor of Allied and Transit on the Fredettes' 93A claim. Allied and Transit duly filed post-trial motions, generally preserving the claims now made on appeal, but motions were denied. Allied and Transit now appeal from the judgments against them. The Fredettes cross appeal from the rejection of their claim against Mullen and the district court's denial of their 93A claim.  1. The Carmack Amendment Claim. The Carmack Amendment, ___________________________ 49 U.S.C. 11707, incorporates common law principles of liability and makes a common carrier liable for "the actual loss or injury to the property" that it transports interstate. Id. 11707(a)(1). Transit was responsible for ___ -7- -7- the move of the mobile home, and the jury awarded the Fredettes $18,500 against Transit for damages to the home. Transit argues that the Fredettes failed to present sufficient evidence of the damages to take the case to the jury; alternatively it seeks remittitur or, in the alternative, a new trial on the issue of damages. A plaintiff suing under the Carmack Amendment may recover as damages only the "actual loss or injury to the property," ordinarily measured either by the reduction in market value caused by the defendant or by replacement or repair costs occasioned by the harm. See, e.g., Oak Hall Cap ___ ____ ____________ & Gown Co., Inc. v. Old Dominion Freight Line, Inc., 899 F.2d ________________ _______________________________ 291, 296 (4th Cir. 1990). There is no recovery under the statute for punitive damages or for damages unrelated to the property at issue. Cleveland v. Beltman North Amer. Co., _________ __________________________ Inc., 30 F.3d 373, 379 (2d Cir. 1994), cert. denied, 115 S. ____ _____ ______ Ct. 901 (1995). Evidence as to the nature and extent of physical damages sustained by the home move was presented primarily by Doris and Paul Fredette and by Irvin Finger; Finger was a contractor who had examined the home at the Fredettes' request when it arrived in North Carolina and compared it to photographs of the home taken on the Pittsfield lot immediately prior to the move. Finger supplied a written list of repair tasks and a proposed price of $10,500. -8- -8- "Before and after" photographs of the home were also admitted into evidence. Although Transit argues that little beyond normal wear and tear was demonstrated, the jury was entitled to find otherwise. The Fredettes described the condition of the home before the move and after, testifying to the broken window and door casing, missing shingles, soiled rugs, damage to aluminum siding and to the roof, a broken sink, and similar injuries discovered when the move was over. Another witness confirmed the existence of damage to the roof and an exterior wall. The jury was also entitled to consider the photographs. Thus, there was ample proof of injury. What is of more concern is the amount of damages awarded by the jury for injury to the mobile home. Even assuming that the jury fully accepted Finger's estimate, the award of $18,500 against Transit--or $8,350 in excess of the damages estimated by him--is puzzling. Possibly, as Transit speculates, the jury included other damages for which Transit was not liable (e.g., damage to the porch and shed which were ____ moved by another company), although the figures do not quite mesh. But Transit has not claimed that the jury was misinstructed, so we have to assume that the jury intended the award to cover the mobile home itself. That presents the question whether the jury was entitled to take the descriptions and photographs of the injuries to -9- -9- the mobile home and then value those injuries more highly than the amount assigned by the Fredettes' own witness. Under the case law, the jury can depart upward, as well as downward, from the opinion of the expert; and this makes good sense wherever the jury could reasonably have valued the damage without any expert opinion.2 The jury could do so for a broken window or dented fender; a defective dynamo would probably be beyond its ken. The injuries to the mobile home are in between but much closer to the broken window. The injuries here (e.g., soiled ____ rugs, repainting, damaged sidings and roof, broken door frame) were not especially exotic in character and nothing prevented the jurors from using their own experience and common sense to adjust upward or downward the expert's own estimate. The award was certainly very generous, in light of Finger's testimony, and a remittitur could have been ordered; but it is hard to say that it was irrational or that the refusal to grant a new trial or remittitur on damages was an abuse of discretion. 2. The Contract Claim. The Fredettes also won a ____________________ judgment of $7,500 against Allied for breach of contract  ____________________ 2See, e.g., Weber v. Chicago & Northwestern Transp. Co., ___ ____ _____ __________________________________ 530 N.W.2d 25, 29 (Wis. App.) ("[t]he jury is not bound by an expert's estimate of damages"), review denied, 534 N.W.2d 85 ______ ______ (Wis. 1995); Birmingham Slag Div. of Vulcan Materials Co. v. _____________________________________________ Chandler, 231 So.2d 329, 331 (Ala. Civ. App. 1970) ("a jury ________ is not bound by opinion evidence of damages, though undisputed"). -10- -10- based on Allied's failure to deliver their home and goods by the guaranteed delivery date. Allied contends that the delay resulted from events outside its control and sought an instruction on frustration of purpose. The district court declined to give such an instruction on the ground that the evidence did not support it. A party is entitled to have its legal theories presented to the jury, if legally correct and supported by the evidence. Sullivan v. National Football League, 34 F.3d ________ _________________________ 1091, 1106-07 (1st Cir. 1994), cert. denied, 115 S. Ct. 1252 ____________ (1995). The determination of whether there was evidence sufficient to require an instruction is made by the district court in the first instance, but is subject to appropriate appellate review. Id. at 1107-09. Assuming arguendo that ___ ________ frustration of purpose is to be determined by the jury in a proper case, see generally E. Farnsworth, Contracts 9.7, at _____________ _________ 722 (2d ed. 1990), no reasonable jury could have concluded here that the contract's purpose had been frustrated. The doctrine of frustration of purpose, recognized in Massachusetts as elsewhere, excuses a party from contractual obligations under certain defined circumstances. The central condition, but not the only one, is that--although "[p]erformance remains possible"--"the expected value of performance to the party seeking to be excused has been destroyed by [the] fortuitous event. . . ." Chase Precast _____________ -11- -11- Corp. v. Paonessa Co., 566 N.E.2d 603, 608 (Mass. 1991), _____ ____________ quoting Lloyd v. Murphy, 153 P.2d 47, 50 (Cal. 1944). If the _____ ______ GE plant in North Carolina had burned down, the Fredettes might have argued (not necessarily with success) that the purpose of the agreement had been frustrated. Obviously, the purpose of the Fredettes' contract with Allied--to arrange for a move of home and possessions to North Carolina--was not frustrated by need for a fourth axle. Allied might have sought an instruction on impossibility or _____________ impracticability of performance, or even on mutual mistake ________________ _______________ relating to the immediate fitness of the mobile home for transportation. Compare Farnsworth, supra, 9.3, 9.5, 9.6. _______ _____ Whether any of these sister doctrines could properly have been invoked is open to dispute; but the dispute need not be resolved because no such instructions were sought. 3. Intentional Infliction of Emotional Distress. Both _____________________________________________ Allied and Transit argue that the trial judge erred in instructing the jury about the elements of the emotional distress claim. The trial judge described the elements of intentional infliction of emotional distress as follows: First, that the defendants intended to cause, or should have known that its [sic] conduct would cause emotional distress; and, Second, that the defendants' conduct was extreme and outrageous; and, Third, that the actions of the defendants caused plaintiffs distress; and, Fourth, that the plaintiffs suffered emotional distress. In determining whether a defendants' [sic] conduct was extreme and utterly outrageous, you must ask yourselves whether the conduct was beyond all -12- -12- bounds of decency and utterly intolerable in a civilized community. Liability can't be founded on mere insults, threats, or annoyances. It should be noted that physical harm to the plaintiffs in [sic] not a required element of this claim. The district court's instructions are taken almost verbatim from a recent decision by the Massachusetts Supreme Judicial Court, Sena v. Commonwealth, 629 N.E.2d 986, 994 ____ ____________ (Mass. 1994). In this case, the defendants submitted proposed instructions that would have required, on the fourth element, that the plaintiffs' emotional distress be "severe" and "of a nature that no reasonable person could be expected ___ to endure it." That language is taken from that court's watershed decision on the tort nearly twenty years ago, Agis ____ v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976) ___________________ (quotations omitted). The district court declined to include the "reasonable person" language, and an objection to this omission was preserved.3 Since Agis, the SJC has all but ignored the "reasonable ____ person" language. Every time that the court has decided an intentional infliction claim since Agis, it has omitted the ____ "reasonable person" language and simply required the  ____________________ 3The judge apparently intended to use the word "severe," but may well have failed to do so. The transcript and the court's post-trial memorandum and order are seemingly in conflict. But if "severe" was omitted, no proper objection was preserved. -13- -13- plaintiff to show "severe" emotional distress.4 This is so even in cases where the severity of the plaintiff's emotional distress is at issue. See, e.g., Haddad v. Gonzalez, 576 _________ ______ ________ N.E.2d 658, 667-68 (Mass. 1991). Because the district court defined the tort precisely as the state's highest court has done for more than a decade, we find no error, much less prejudicial error. Both Allied and Transit also contend that they are entitled to judgment as a matter of law or a new trial on this claim. The former remedy requires that "no reasonable jury could have returned a verdict adverse to the moving party." Havinga v. Crowley Towing & Trans. Co., Inc., 24 _______ ___________________________________ F.3d 1480, 1483 (1st Cir. 1994), and we review de novo the _______ district court's decision on such a motion. Id. As for a ___ new trial, this may be granted if the district court finds that the jury's verdict is against the clear weight of the evidence; a refusal to grant a new trial is reviewed only for abuse of discretion. Phav v. Trueblood, Inc., 915 F.2d 764, ____ _______________ 766 (1st Cir. 1990). Allied and Transit argue that their conduct, even if wrongful, was not bad enough to be deemed extreme and  ____________________ 4See, e.g., Bowman v. Heller, 651 N.E.2d 369, 373 n.6 _________ ______ ______ (Mass. 1995); Sena, 629 N.E.2d at 994; Haddad v. Gonzalez, ____ ______ ________ 576 N.E.2d 658, 667-68 (Mass. 1991); Nancy P. v. D'Amato, 517 ________ _______ N.E.2d 824, 827 (Mass. 1988). The court referred to the "reasonable person" language in an opinion about negligent _________ infliction of emotional distress in 1982. See Payton v. ___ ______ Abbott Labs, 437 N.E.2d 171, 180 (Mass. 1982). ___________ -14- -14- outrageous. In part, this argument rests on an effort to disassociate themselves from Bedford, who refused to place the home on the lot even after the Fredettes had made the initial adjustment Bedford demanded. But the Fredettes presented evidence that Transit had ratified Bedford's demands that the North Carolina lot be levelled further, and that Transit and Allied had approved Bedford's decision to leave the site with the home still not in place. There was other conduct of which the jury might have disapproved. Transit took the lead in seeking to obtain a release from the Fredettes that seemingly went well beyond the danger that occasioned the demand. Allied waited a week before sending a crew to block and level the site once the home was moved to North Carolina, and it waited three weeks more to deliver the Fredettes' belongings (including their car, furniture and the steps to their home) until the Fredettes paid the disputed storage charges. Most of the Massachusetts cases cited to us by defendants are distinguishable, but Transit has a plausible argument that the conduct here is not much worse than that held insufficient in Foley v. Polaroid Corp., 508 N.E.2d 72 _____ ______________ (Mass. 1987); there, an employee acquitted of assault was sidetracked in his job and ostracized by other employees. Still, in Foley the SJC thought that the company's formal _____ actions were consistent with "a good faith effort to maintain -15- -15- Foley's employment in a manner consistent with Polaroid's legitimate business concerns," id. at 82; and the court ___ apparently equated the harassment with "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" for which recovery is not permitted under this claim. Id. ___ Here, we think that the jury was entitled, although hardly compelled, to find bad faith; and the delays and withholding of property and services go somewhat beyond the verbal and other minor abuses that Polaroid employees directed against Foley. Further, given the interplay between Allied, Transit and Bedford, the jury was entitled to view the conduct as a whole and not as isolated minor wrongs. So viewed, we think that the deference to be accorded to the jury's judgment on issues of this kind keeps the verdict just this side of the dividing line.  4. The Fredettes' 93A Claim. The Fredettes also __________________________ claimed against the defendants for violation of Massachusetts' far-reaching consumer protection law, Mass. Gen. L. ch. 93A. That law proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce" and provides a private right of action for aggrieved individuals. The 93A claim was tried to the district court after the jury verdict on the other counts. The court found -16- -16- that no violation had occurred, and ruled in favor of the defendants. The Fredettes argue that this ruling was error. Although 93A is phrased in terms different than the emotional distress tort, the analogy is closer than language might suggest. The "unfair or deceptive" label sounds like a very low threshold, but the Massachusetts courts have repeatedly held that 93A requires conduct that is immoral, unethical or unscrupulous or at least attains "a level of rascality" that goes well beyond ordinary tough business practice. Industrial Gen. Corp. v. Sequoia Pacific Sys. _______________________ _____________________ Corp., 44 F.3d 40, 43 (1st Cir. 1995) (citing numerous _____ Massachusetts cases). Here, in deciding the 93A claim as the finder of fact, the district judge was entitled to reach a judgment independent of the jury on such issues as the existence and extent of deception, unfairness and bad faith. Whether or not the judge's findings can be squared with the jury's does not matter, so long as the former's findings are not clearly erroneous and the latter's are within the bounds of reason. Wallace Motor Sales, Inc. v. American Motor Sales Corp., 780 __________________________ __________________________ F.2d 1049, 1063-64 (1st Cir. 1985). Precisely because this is a borderline case, we think that the respective standards of review protect both factfinders. The Fredettes also rely on a regulation issued by the Massachusetts Attorney General which provides that "[i]t is -17- -17- an unfair and deceptive act or practice: (a) To advertise or promise prompt delivery where delivery is neither prompt nor expeditious." 940 C.M.R. 3.15. But we read this to refer to a pattern of conduct, or at least to an individual occasion in which the promisor knows that it is making untrue representations. Whatever other criticisms may be made of Allied, nothing suggests that its original delivery date was a representation made in bad faith. The Fredettes' other theory is that the defendants behaved unfairly and deceptively by specifying a price that the Fredettes believed to be all-inclusive and then imposing a succession of additional charges and demands (e.g., the ____ storage fees, expenses relating to the new lot). But the district judge as the trier of fact was entitled to take a more benign view and regard these extra demands as not clearly beyond what was agreed to or as occasioned by developments that no one had foreseen. This view, although not compelled, was not clearly erroneous. 5. The Dismissal of Mullen. At the close of their _________________________ brief as appellants, the Fredettes argue that Mullen should not have been dismissed as a defendant at the close of the evidence. Lindburg, they say, acted as the agent for both Mullen and Allied; and Mullen is responsible, they argue, for the wrongs they attribute to Lindburg. These wrongs they identify as (1) misadvising the Fredettes that their move was -18- -18- "fully covered" and "fully insured" and (2) mishandling the original inspection and measurements of the home and thereby causing a significant portion of the delay in the move. It is not clear why this claimed error matters to the Fredettes since Allied and Transit are presumably solvent, and the Fredettes cannot collect twice for the same wrongs. But in any event we see little indication that Lindburg was independently culpable: there is no evidence that he told the Fredettes anything he had reason to believe to be untrue; and the Fredettes point us to nothing in the record that would show that Lindburg knew or should have known that the mobile home would sag when removed from its supports. Affirmed. _________ -19- -19-