ASTRA USA, INC. *vs.* LARS P.E. BILDMAN; CARL-GUSTAF
JOHANSSON & others,[1] third-party defendants
(and a companion case[2]).

Suffolk. May 5, 2009. - October 5, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & BOTSFORD, JJ.

*Corporations,* Officers and agents. *Employment,* Sexual harassment, Forfeiture
of compensation. *Contract,* Employment, Rescission, Forfeiture of
compensation. *Fiduciary. Practice, Civil,* Attorney's fees. *Libel and Slander.*

This court declined to disturb a trial court judge's grant of summary judgment
in favor of an employee (an officer and director of the corporate employer)
on his former employer's claim seeking rescission of an employment
agreement, where the employer failed to establish that the employee had
affirmatively misrepresented any material fact during the negotiations of
the agreement, and where resolution of other claims between the parties
made the remedy of rescission duplicative. [127-128]

In a civil action in which the jury found an employee (an officer and director
of the corporate employer) liable to his former employer for numerous and
substantial breaches of fiduciary duty, the judge, in hearing the employer's
motion for postjudgment equitable relief, erred in declining to order the
employee's forfeiture, under New York law, of all compensation paid by
the employer during the period in which he committed the breach (and
instead limiting the remedy, based on Massachusetts doctrines of equitable
forfeiture, to compensation in excess of the value of his services during
that period), where application of the "faithless servant" doctrine under
New York law required that the employee forfeit all of his salary and
bonuses for the period in question, and the judge was without authority to
rule otherwise. [128-129,131-136]

Discussion of New York forfeiture law. [129-131]

In a civil action in which the jury found an employee (an officer and director
of the corporate employer) liable to his former employer for numerous and
substantial breaches of fiduciary duty, including sexual harassment of other
employees, the judge did not err in keeping from the jury the confusing
and time-consuming issue of the employer's recovery of damages from the
employee for its costs of investigating the sexual harassment charges, or in
declining the employer's posttrial motion for such costs, given the
employer's failure to provide sufficient evidence on causation. [136-139]

In a civil action in which the jury found an employee (an officer and director
of the corporate employer) liable to his former employer for numerous and

[1]Astra AB and Hakan Mogren.
[2]Lars Bildman *vs.* Hakan Mogren & others.

substantial breaches of fiduciary duty, the judge did not err in denying the employee's motion for judgment on his counterclaim for legal fees and costs under an employment agreement between the parties, where the language of the agreement limited the employer's obligation to pay such damages when the employee defrauded or otherwise wronged the employer; further, there was no merit to the employee's claim that he was entitled at least to reimbursement of legal fees and costs related to his successful claim regarding stock options. [139-143]

A trial court judge, in awarding summary judgment in favor of an employer on a defamation claim by an employee (an officer and director of the corporate employer), correctly concluded that the employee was a limited purpose public figure in relation to the allegedly defamatory statements. [143-146]

CIVIL ACTIONS commenced in the Superior Court Department on February 4, 1998, and April 28, 1999.

After consolidation, motions for summary judgment were heard by *Margaret R. Hinkle*, J.; the cases were tried before her, and motions for postverdict relief also were heard by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jeffrey S. Robbins* (*Joseph D. Lipchitz & A.W. Phinney, III,* with him) for Astra USA, Inc.

*Rebecca P. McIntyre & Michael D. Weisman* for Lars P.E. Bildman.

*David E. McCraw*, of New York, *& Jonathan M. Albano, Carol E. Head, & Shuan Lue*, for Globe Newspaper Company, Inc., amicus curiae, submitted a brief.

MARSHALL, C.J. A Superior Court jury found Lars P.E. Bildman liable to his former employer, Astra USA, Inc. (Astra),[3] for fraud, conversion, waste of corporate assets, breach of fiduciary duty, and sexual harassment of Astra employees, and awarded Astra damages in the aggregate amount of $1,040,812. The same jury found Astra not liable to Bildman for breach of a 1993 employment agreement between the parties (employment agreement), but awarded Bildman $203,691 in damages related to a

---

[3] At all relevant times, Astra USA, Inc. (Astra), was a wholly owned subsidiary of Astra AB, a Swedish corporation. Presently, according to Astra, Astra is "a wholly-owned subsidiary of AstraZeneca Treasury Limited, which is, in turn, owned by AstraZeneca UK Limited, a subsidiary of AstraZeneca Intermediate Holdings Limited. AstraZeneca PLC, a publicly traded company, owns Astra-Zeneca Intermediate Holdings Limited . . . ."

March, 1996, supplemental stock grant. The jury returned verdicts against Bildman on his claims of intentional interference with contract against Hakan Mogren and Carl-Gustaf Johansson, two officials of Astra's Swedish parent corporation, Astra AB. Prior to trial, the judge dismissed on summary judgment Bildman's claim for attorney's fees and costs (attorney's fees) under the employment agreement and his libel action against Astra, Mogren, and Johansson; she also ruled that Astra could not rescind the employment agreement. Following a posttrial evidentiary hearing, the judge ruled that Astra could not recover by forfeiture the compensation it paid to Bildman from 1990 through his termination in June, 1996, the period in which he committed the breach of his fiduciary obligations to Astra.

Final judgment on all claims of all parties in the consolidated actions entered on January 30, 2006. Following the denial of Bildman's motion for judgment notwithstanding the verdict or alternatively for a new trial, and his motion to alter or amend the final judgment, the parties cross-appealed. We transferred the case here on our own motion.

Five questions emerge on appeal from this lengthy and complex trial. Three are presented by Astra: (1) Did the Superior Court judge err in ruling that Astra was *not* entitled to rescind the employment agreement? (2) Did the judge err in the manner in which she applied New York law to the forfeiture issue? (3) Did the judge err in not allowing Astra to recover damages from Bildman for its costs of investigating charges of sexual harassment at Astra by Bildman and others? Bildman presses two issues on appeal: (4) Did the judge err in ruling that Astra had no obligation to pay Bildman's legal fees and costs in the consolidated actions? (5) Was summary judgment properly entered against Bildman on his libel claims?

On review of the voluminous record and the judge's orders and well-reasoned memoranda of decision, we affirm the judgments against Astra on the issues of rescission and recovery of its sexual harassment investigation costs. We also affirm the judgments against Bildman on the issues of his attorney's fees and his libel claims. We reverse the judgment denying Astra recovery of compensation it paid to Bildman during the period of his disloyalty — $5,599,097 in salary and $1,180,000 in bonuses. We affirm the jury's verdict awarding Bildman $203,691

in damages related to the supplemental stock grant, because on appeal Astra has waived any claim of forfeiture of that award. As we explain more fully below, the judge's forfeiture rulings are incompatible with the law of New York, the State where Astra is incorporated,[4] which in the circumstances of this case requires forfeiture of the salary and bonuses Bildman earned during the period of his disloyalty. We remand the case to the Superior Court for entry of judgments consistent with this opinion.[5]

We now summarize the salient facts, necessarily in some detail because of the scope of the legal issues. Our factual summary draws on the evidence presented to the jury and the judge's findings on the remainder, which we supplement with uncontroverted material of record.

1. *Factual background.* Astra is a pharmaceutical company incorporated in New York, with its principal place of business in Westborough. During the relevant times, it was one of many worldwide subsidiaries of Astra AB, which is a Swedish pharmaceutical manufacturing corporation publicly traded on the New York Stock Exchange. In 1981, Bildman, a Swedish national, became president and chief executive officer of Astra (then called Astra Pharmaceuticals), and served as a member of the boards of directors of Astra and Astra Germany. In 1993, he and Astra entered into an employment agreement, which was in effect from July 1, 1993, until his employment was terminated on June 25, 1996.[6]

In 1988, Hakan Mogren became the president and chief executive officer of Astra AB. Among other things, he established a strategic goal to increase Astra's presence in the United States pharmaceutical market. Bildman successfully implemented this strategy by, among other things, effecting what the judge termed "significant management changes" and creating a new "Rx

---

[4]In *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 471 (2001), we reaffirmed the Commonwealth's "long-standing policy of applying the law of the State of incorporation to internal corporate affairs."

[5]We acknowledge the amicus brief submitted by the Globe Newspaper Company, Inc., in support of Astra.

[6]From 1981 to July 1, 1993, Bildman's employment at Astra was governed by the terms of an "expatriate agreement" between himself and Astra AB, which provided for the payment of enumerated expenses related to employment abroad. The terms of the expatriate agreement, including salary and benefits, varied from time to time.

Division," which targeted the so-called "general practitioner market," the sector of the pharmaceutical industry focused on outpatients and physicians' offices.[7] By 1995, the Rx Division employed a sales force of approximately 500. Although the Rx Division was not profitable during Bildman's tenure, Astra and Astra AB had expected that result. From 1991 to 1996, Astra's over-all profit met or exceeded the goals established for it by the parent company, and Bildman's salary and bonuses rose steadily.[8] In 1995, Mogren promoted Carl-Gustaf Johansson to the position of Astra AB Regional Director for North America. The newly created position gave Johansson direct supervisory authority over Astra and Bildman. Johansson and Bildman soon were in dispute over the strategic direction of Astra, the details of which we need not recite.

In December, 1995, Bildman learned that Business Week was investigating allegations of sexual harassment at Astra committed by him and other members of Astra's senior management. At the time, neither Astra's nor Astra AB's board of directors was aware of sexual harassment "problems" at Astra. There was in fact a problem, and it centered on Bildman. As early as 1985, Bildman had authorized and personally signed a "consulting agreement" for his former secretary, with compensation of $3,164 per month. The former secretary testified at trial that she left the company after she had been forced to have sexual relations with Bildman. In 1993, Bildman authorized a settlement payment of approximately $25,000 to another female employee who had filed a complaint with the Massachusetts Commission Against Discrimination alleging that he had sexually harassed

---

[7]The judge found that "[t]he prescription drug market in the United States has two primary sectors: the hospital sector and the . . . general practitioner market ('the GP market'). At relevant times, the hospital sector represented about 10 percent of the total American prescription drug market, with the remaining 90 percent in the GP market."

[8]The judge found that, "[i]n 1991, Astra paid Bildman a total of $928,751.60, including a bonus of $300,000. In 1992, it paid him $893,098.18, including a bonus of $300,000. In 1993, it paid him $955,348.56, including a bonus of $200,000. In 1994, it paid him $848,824.61, including a bonus of $180,000. In 1995, it paid him $1,028,583.75, including a bonus of $200,000. In 1996, it paid him $944,490.50, and awarded him a supplemental stock grant valued at $203,691 in March of that year." Itemized by type of compensation, these numbers have a combined value of $5,599,097 in salary, $1,180,000 in bonuses, and a stock grant valued at $203,691.

her. In 1994, Bildman ordered Astra's general counsel to pay $50,000 to settle a sexual harassment claim against him by another female employee, as well as a payment of $95,000 to an employee who claimed that she had been fired in retaliation for reporting a complaint of sexual assault by another member of Astra's senior management. In early 1996, Bildman authorized a payment by Astra of $100,000 to settle sexual harassment claims against him by yet another former Astra employee (also female). Each of these settlement agreements was confidential and, among other things, prohibited the complainant from cooperating with the Equal Employment Opportunity Commission (EEOC) in any investigation of sexual harassment at Astra. At all relevant times, Astra had a written sexual harassment policy that forbade the acts alleged to have been committed by Bildman and other male executives with his knowledge or condonation.[9]

In a December 19, 1995, telephone conference, Bildman; Charles Yon, Astra's corporate counsel; and Astra's outside employment counsel informed Johansson and other Astra AB officials of the Business Week investigation of allegations of sexual harassment at Astra. Bildman then assembled a task force, comprised of Yon and outside attorneys and consultants, to monitor and investigate the Business Week probe. The task force was not set up to investigate the merits of the sexual harassment claims but rather to determine Business Week's sources of information and to control the flow of information to Business Week and Astra AB. In a January 15, 1996, letter, Bildman informed Mogren that Business Week was investigating "alleged incidents of sexual harassment at Astra," that Astra was conducting an "extensive investigation" of the development, and that Astra was "positive there is no basis for such a story and believe[s] that it is very unlikely that an article will be written." The letter did not mention that Bildman himself was a target of the Business Week inquiry, although Bildman knew this was the case. Bildman subsequently forwarded to Mogren and Johansson a task force report prepared on or about January 16, 1996, a

[9]The numerous sexual harassment allegations by female employees against Bildman, in addition to a claim by his former secretary of coerced sexual relations, included, among others, sexually inappropriate comments, kissing or attempts to kiss, inappropriate touching of employees' necks and buttocks, and dancing with female employees in a sexually provocative manner.

copy of which was entered in evidence, which concluded that Astra had a good record concerning sexual harassment, and that the Business Week investigation likely was instigated by an Astra competitor, a position Bildman continued to maintain throughout the early spring to Astra AB executives and to Astra's board of directors.[10]

At a meeting of Astra's board in March, 1996, Bildman, at the suggestion of Mogren and Johansson, made a presentation about the Business Week matter. With him was Yon and another Astra employee, who assured the board that Astra had "very good records" concerning sexual harassment claims and that its statistics on sexual harassment over the previous eight to ten years compared favorably with those of comparably sized companies. At one point during the board meeting Mogren asked all three employees whether Astra had anything "to be ashamed of" in relation to sexual harassment charges. Yon answered that it did not. At a meeting in Stresa, Italy, in mid-April, Bildman again assured Astra AB officials of Astra's allegedly good record on sexual harassment, even though he also stated that he feared that Business Week was about to publish an article about widespread sexual harassment at Astra.[11]

From that point, events unfolded quickly. On April 16, Mark Maremont of Business Week wrote a two-page letter asking to speak with Bildman and Astra AB about "serious allegations of sexual harassment" at Astra, including allegations concerning Bildman. That same day, Maremont also sent a letter to Mogren in Sweden that enclosed his letter to Bildman and offered an opportunity for Astra AB to respond to the allegations. The next day, April 17, Yon sent a letter to Maremont denying the allega-

---

[10]The jury heard testimony that Bildman told Johansson and other witnesses that he suspected that the competitor urging the Business Week investigation was Astra-Merck, Inc., a joint venture between Astra AB and Merck, Inc., licensed to sell Astra products in the United States. The jury also heard testimony that, as of spring, 1996, Bildman and Johansson disagreed sharply about whether certain products should be sold by Astra or Astra-Merck. In a vain attempt to support his suspicions that Mogren and Johansson were not acting in the best interests of Astra, and in response to the Business Week probe, Bildman surreptitiously tape recorded telephone conferences with Johansson and Mogren from Rhode Island, a one-party consent State.

[11]From December, 1995, through March, 1996, Bildman apparently also orchestrated a campaign to direct female and minority Astra employees to write letters of support for him to Astra AB.

tions and offering to meet with Maremont if Maremont provided more details about the charges. Maremont responded on April 18 with a seven-page letter to Yon offering additional substantiation, and on April 19 Yon forwarded a copy of the letter to Mogren, Johansson, and other Astra AB officials.[12] On receiving the letter, Johansson; Astra AB general counsel, Goran Lerenius; and Thomas Clauss, Jr., a partner in the law firm of Winthrop, Stimson, Putnam & Roberts (Winthrop Stimson), went to Astra's headquarters in Westborough to conduct their own investigation. On April 22 and April 23, they interviewed Astra employees, including Bildman, about the Business Week allegations. As a result of its investigation, on April 28, 1996, the board of directors of Astra voted unanimously to suspend Bildman with pay, to appoint an interim president-chief executive officer of Astra, to create a special committee chaired by Johansson to investigate "allegations of sexual harassment and other improprieties or failures to abide by policies and procedures" of Astra, and to report its findings to the full board. The special committee subsequently retained Winthrop Stimson to conduct the investigation.

Johansson informed Bildman by letter of the board's decisions and asked Bildman that he both cooperate fully in the investigation and refrain from contacting any current or former Astra employees about it. Bildman did neither. He refused repeated requests from the Winthrop Stimson investigators to be interviewed. In addition, he and Lars Magnusson, a consultant at Astra whom Bildman had hired in January, 1996, contacted former and current Astra employees, asking them to deny that Bildman ever acted improperly toward female employees, and threatened others with termination or adverse publicity if they cooperated with Winthrop Stimson. The jury also heard evidence that, at Bildman's direction and without the knowledge of Astra's board, Magnusson set up a five-employee satellite office from which he shredded corporate documents; that he and Bildman removed Astra documents, including financial documents, from Bildman's office; and that after receiving a telephone call from Bildman, Magnusson had company computers "erased."

In addition to uncovering evidence of pervasive sexual harass-

---

[12]The letter, although heavily redacted, was admitted in evidence.

ment of female Astra employees by Bildman and others in senior management, and evidence of the threats to employees and destruction of company documents mentioned above, the Winthrop Stimson investigation found, and the jury heard evidence of, serious financial and other improprieties.[13]

In early May, 1996, Maremont's article appeared as the cover story in Business Week, under the title "Abuse of power: The astonishing tale of sexual harassment at Astra USA." Business Week reported that it had interviewed "more than 70 former and current employees" and found "a disturbing pattern of complaints during much of Bildman's 15-year tenure," including "a dozen cases of women who claimed they were either fondled or solicited for sexual favors by Bildman or other [Astra] executives." Not surprisingly, the Business Week article drew national and international attention. Reports about sexual harassment at Astra and by Bildman appeared in the Boston Globe, the Providence Journal-Bulletin, the Wall Street Journal, and in over 150 articles in various publications worldwide.

On June 25, 1996, Astra's board of directors voted to rescind the employment agreement and terminate Bildman's employment for cause,[14] and he was so notified by letter. In February,

---

[13]The evidence includes the following:

Bildman employed Astra vendors, including contractors, landscapers, and craftsmen, to do extensive work on the interior and exterior of his residences in Massachusetts and his vacation home in Vermont, and surreptitiously had the work billed to and paid by Astra, in an amount estimated at $2 million for contractor services and $110,000 for landscaping and design services.

Bildman chartered yachts for two- or three-day personal sailing trips at Astra's expense without identifying the specific nature of the charges.

Bildman hired "[y]oung and attractive" female "escorts" for himself and others, and billed the expenses to Astra without identifying the specific nature of the charges.

Bildman used Astra employees to provide personal services for him on company time, including work relating to maintaining his antique automobile collection and providing private tennis lessons to his family.

Bildman directed Astra to pay $16,000 in legal costs he incurred contesting a speeding ticket fining him sixty-six dollars.

During the course of the investigation, Bildman contacted Astra vendors with requests that they alter their business records to reflect that he personally had paid for items actually paid for by Astra.

[14]At trial, Bildman testified that the employment agreement "does, of course, not permit me to engage in wrongful behavior against the company. No, it does not."

1998, the EEOC filed a complaint against Astra alleging a pattern and practice of sexual harassment of Astra female employees since "at least January 1, 1993 and continuing." The complaint resulted in a consent decree in which Astra, although not admitting liability, established a $9,850,000 fund to compensate victims of sexual harassment at the company.[15]

2. *Procedural background.* On February 4, 1998, Astra filed suit in the Superior Court against Bildman for fraud, breach of fiduciary duty and the duties of good faith and loyalty, waste of corporate assets, rescission of the 1993 employment agreement, and conversion. It sought a declaratory judgment that it had properly rescinded the employment agreement, and damages on the remaining counts. Bildman counterclaimed against Astra and third-party defendant Astra AB for, as amended, breach of contract, violation of G. L. c. 149, § 148 (fair wage practices act), and indemnification of attorney's costs and expenses for the civil action and for "successfully defending" the criminal action. Bildman also filed an action against Astra, Mogren, and Johansson for malicious libel, negligent libel, and libel per se. The two actions were consolidated, and were specifically assigned to one judge in the Superior Court. Of relevance to this appeal are the following proceedings in the consolidated cases.

In December, 2000, the judge granted Bildman summary judgment on Astra's claim for a judgment declaring that it properly rescinded the employment agreement. In October, 2001, the judge granted Astra's summary judgment motion on all of Bildman's libel claims on the ground that Bildman was a "limited public figure" and could not maintain a claim for negligent libel, citing *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). The judge also denied Bildman's motion for attorney's fees, concluding that the issue turned on whether Astra had terminated Bildman's employment for cause, a matter to be determined by a jury. The parties' remaining claims were tried before a jury.

The trial commenced in January, 2002, and took more than

[15]In March, 1997, Bildman was indicted by a Federal grand jury for wire and mail fraud, filing false tax returns, and conspiracy for receiving various goods and services from Astra that he failed to report as income. In January, 1998, he pleaded guilty to three counts of wilfully filing false Federal tax returns. By plea agreement, the remaining counts were dismissed, including counts charging Bildman with defrauding Astra.

seven weeks. On February 21, 2002, the jury found Bildman liable to Astra for fraud, conversion, waste, and breach of fiduciary duty by, in the words of the verdict form, "making affirmative misrepresentation or failing to disclose to Astra material information which he had a duty to disclose," and for "improper use of Astra funds." As noted, the jury awarded Astra damages in the aggregate amount of $1,040,812. Further, the jury found that Bildman engaged in sexual harassment of Astra employees and that he retaliated against Astra employees who had exercised their rights to make complaints under Astra's sexual harassment policy. (The verdict form did not provide for additional damages for these acts.)

As to Bildman's claims, the jury found that Astra did not commit a breach of the employment agreement in terminating Bildman or with regard to Astra's profit sharing plan. The jury also found against Bildman on his claims that Mogren and Johansson intentionally interfered with his employment contract with Astra. Finally, the jury found that Bildman did not fraudulently induce Astra to enter into a March, 1996, supplemental stock grant, and awarded him $203,691 under the agreement.[16]

Both parties filed postjudgment motions for relief. Astra renewed its request for rescission of the employment agreement, and requested rescission of the 1996 stock agreement, forfeiture of all of Bildman's compensation from 1991 to 1996,[17] setoff, and punitive damages. On May 5, 2005, the judge issued a memorandum of decision and order permitting setoff of Bildman's $203,691 jury award against Astra's damages, refused to revisit her pretrial rulings on rescission, held that Astra was entitled to an evidentiary hearing on the issue of forfeiture limited to the issue whether Bildman's compensation exceeded the value of his services for the period 1991-1996, and declined Astra's further requests for postjudgment relief. The judge held an evidentiary hearing on the forfeiture claim and ruled that Astra was not entitled to recover any amount by way of forfeiture because the value of Bildman's services was commensurate with his value to the company through 1996. Bildman renewed his motion for

---

[16]The judge subsequently offset Bildman's damages award against Astra's. See *infra.*

[17]The issue of forfeiture did not go to the jury, the judge having determined to reserve the matter for postverdict consideration.

indemnification and for attorney's fees, which the judge denied on May 5, 2005.

We now proceed to consider the five issues on appeal.

3. *Rescission.* Astra claims that it properly rescinded the 1993 employment agreement because during contract negotiations Bildman failed to disclose material information about his own breaches of fiduciary duty, which (Astra claims) he had an affirmative duty to do as a company officer and director. The judge granted Bildman's summary judgment motion on Astra's rescission claim. The judge reasoned, in essence, that Astra had failed to establish that Bildman affirmatively misrepresented any material fact during the negotiations of the employment agreement, and that it would be inequitable to permit rescission three years after the inception of the employment agreement where Astra never inquired about the conduct in question. She declined to revisit her ruling after the verdict when Astra again sought rescission of the employment agreement and the supplemental stock grant based on the jury's findings.

On appeal Astra maintains that Bildman, as president and chief executive officer of Astra, had fiduciary obligations to Astra that required him to disclose his disloyal acts in the course of negotiating his 1993 employment agreement with Astra, and that his silence concerning them was an affirmative misrepresentation. See, e.g., *Geller* v. *Allied-Lyons PLC*, 42 Mass. App. Ct. 120, 125-126, 127 (1997) (agreement void and unenforceable where corporate fiduciary gave, at best, only "sotto voce indications" of his self-interested dealings to his principal; "full and fair disclosure" of self-dealing was required). Bildman counters that, while he was negotiating the employment agreement with Astra, he was a "private individual" engaged in an arm's-length transaction, whose fiduciary obligations to the company were effectively held in abeyance.[18]

The employment agreement states that it shall be construed and enforced "in accordance with the laws of the Commonwealth

---

[18]The jury heard conflicting evidence about whether Bildman's negotiations with Astra over the terms of the 1993 employment agreement were at arm's length. Bildman testified that Attorney Neal Tully was both Bildman's private attorney and the secretary of Astra's board of directors. Tully, according to Bildman, provided Bildman with "advice" on the employment agreement and acted as a "liaison" for the parties during contract negotiations.

of Massachusetts," and neither party contends otherwise. Under our law, rescission is an equitable remedy, within the judge's sound discretion. See *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 536 (1986); *Augustine* v. *Rogers*, 47 Mass. App. Ct. 901, 902 (1999) ("rescission is an equitable remedy awarded at the discretion of the court"). Both because we discern no abuse of discretion in the judge's rulings on rescission and because our conclusions below on the issue of forfeiture make the remedy of rescission duplicative, at least with respect to Bildman's salary and bonuses,[19] we will not disturb the judge's grant of summary judgment to Bildman on Astra's rescission claim.

4. *Forfeiture*. a. *Introduction*. As noted earlier, the judge reserved the issue of forfeiture for judicial determination, if necessary, following the jury's verdict. Cf. *Ulico Cas. Co.* v. *Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 13 (N.Y. 2008) (forfeiture of attorney's compensation during period of alleged disloyalty is factual issue to be decided posttrial on full record, if necessary). After the jury found Bildman liable to Astra for breach of fiduciary duty, Astra moved for postjudgment equitable relief on its forfeiture claim. The judge correctly determined that New York law governed that claim. *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 470-471 (2001). See note 4, *supra*. She ordered an evidentiary hearing on forfeiture limited to the question whether Bildman's compensation during the period of his disloyalty, 1991 through 1996, exceeded the value of his services. Based on her determination that Astra failed to prove that Bildman's compensation exceeded the value of his benefit to Astra, and that forfeiture of all of Bildman's compensation would impose a "disproportionately harsh" penalty on Bildman, the judge declined to exercise her discretion to order repayment of his salary and bonuses.

Astra continues to maintain that, under New York's strict application of the forfeiture doctrine, Bildman must forfeit all of his salary and bonuses from 1991 through 1996, an amount in excess of $5 million.[20] It argues that the judge erred as a matter of law

---

[19]Astra does not specify the nature or amount of its damages under the remedy of rescission.

[20]Astra does not argue for forfeiture of any form of compensation other than Bildman's "salary" and "bonuses." On appeal Astra seeks forfeiture of

and abused her equitable powers by limiting the remedy of forfeiture under New York law to Bildman's compensation in excess of the value of Bildman's services during the period of disloyalty, 1991 through 1996.

We review the judge's forfeiture order de novo, taking into consideration New York's forfeiture law. See *Phansalkar* v. *Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003) (reviewing de novo trial court's application of New York forfeiture law). The judge appropriately and commendably sought to exercise her equitable powers fairly within what she perceived to be the latitude afforded her by New York law. We reverse because we conclude that, in the circumstances of this case, application of New York's "faithless servant" doctrine requires that Bildman forfeit all of his salary and bonuses from Astra for the period of disloyalty and that the judge was without authority to rule otherwise.[21]

We begin with a brief overview of New York forfeiture law.

b. *Equitable forfeiture under New York law.* The remedy of equitable forfeiture in New York is grounded on that State's law of agency, in particular on its "faithless servant" doctrine. See generally R.L. Haig, Commercial Litigation in New York State Courts § 75.51 (2d ed. 2005). Under that doctrine, "[a]n agent is held to uberrima fides [utmost fidelity] in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit *any* right to compensation for services" (emphasis added). *Murray* v. *Beard*, 102 N.Y. 505, 508 (1886). See *Lamdin* v. *Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138

---

Bildman's combined salary and bonuses from 1991 through 1996, "a total of $5,599,097 in salary and another $1,180,000 in bonuses." Astra's totals do *not* include the $203,691 value of the 1996 supplemental stock grant, an amount also listed in the judge's findings. Astra therefore has waived any claim for forfeiture of the stock grant.

[21]Although Astra's complaint alleges breaches of fiduciary duty dating back "from the 1980s," and the judge at one point in her postjudgment memorandum of decision concerning forfeiture states that Astra sought forfeiture of Bildman's compensation from 1990 to 1996, both the judge's posttrial decision on forfeiture and, apparently, Astra's appeal focus on the period 1991 through 1996, which we hold to be the forfeiture period.

(1936) (employee or agent "forfeits his right to compensation for services rendered by him if he proves disloyal"). See also *Royal Carbo Corp.* v. *Flameguard, Inc.*, 229 A.D.2d 430, 430 (N.Y. 1996) ("well settled that one who owes a duty of fidelity to a principal and who is faithless in the performance of his or her services is generally not entitled to recover compensation, whether commissions or salary"); *Soam Corp.* v. *Trane Co.*, 202 A.D.2d 162, 163 (N.Y. 1994) ("agent is held to the utmost good faith in his dealings with his principal, and forfeits any right to compensation for his services if he acts adversely to his employer"); *Bon Temps Agency Ltd.* v. *Greenfield*, 184 A.D.2d 280, 281 (N.Y. 1992) ("disloyal employee is not entitled to receive compensation, whether commissions or salary").

The law of New York requires the disloyal employee to forfeit his compensation even if he otherwise performed valuable services for the principal. As the Court of Appeals of New York stated in its often-cited modern case on forfeiture: "One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary . . . . Nor does it make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent." *Feiger* v. *Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928-929 (1977). This principle was recently reaffirmed in *William Floyd Union Free Sch. Dist.* v. *Wright*, 61 A.D.3d 856 (N.Y. 2009), in which the Appellate Division of the New York Supreme Court reversed a trial court decision limiting forfeiture of retired disloyal employees' retirement insurance benefits to ten years. The court held that where "defendants engaged in repeated acts of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted under the faithless servant doctrine." *Id.* at 859.[22]

The rule enunciated in *Murray* v. *Beard*, *supra*; *Feiger* v. *Iral Jewelry, Ltd.*, *supra*; and the other cases cited above might seem to imply that disloyal employees and agents must forfeit all

---

[22]For equitable forfeiture to apply under New York law, the disloyal employee's breach of fiduciary duty need not rise to the level of fraud. See *Phansalkar* v. *Andersen Weinroth & Co.*, 344 F.3d 184, 204 (2d Cir. 2003) (finding "nothing in New York law to suggest that a specific intent to defraud is necessary to render misconduct sufficient to warrant forfeiture").

compensation ever received from the employer. See *Phansalkar* v. *Andersen Weinroth & Co.*, *supra* at 204 (noting traditional rule). New York's intermediate courts, however, have, although not always uniformly or consistently, carved out limitations to absolute forfeiture. For example, Appellate Division decisions generally have limited the period of forfeiture to the period of the employee's disloyalty. See, e.g., *Soam Corp.* v. *Trane Co.*, *supra* at 163 (defrauded principal not liable to disloyal agent for commission fees earned during period of disloyalty); *Maritime Fish Prods., Inc.* v. *World-Wide Fish Prods., Inc.*, 100 A.D.2d 81, 91 (N.Y. 1984) (employee who worked for company for approximately seven years must forfeit compensation received during fourteen-month period of disloyalty). Others have required the disloyalty to be substantial and pervasive for forfeiture to apply. See, e.g., *Matter of Blumenthal*, 32 A.D.3d 767, 768 (N.Y. 2006) ("In light of respondent's repeated disloyalty throughout his tenure, there is no merit to his assertion that there should have been an apportionment of his salary or . . . commissions as to which disloyalty was not found"). See also *Phansalkar* v. *Andersen, Weinroth & Co.*, *supra* at 202 n.13. These limitations are narrow, however, and do not destroy the vitality of the faithless servant doctrine under New York law.[23] See, e.g., *William Floyd Union Free Sch. Dist.* v. *Wright*, 61 A.D.3d 856, 859 (N.Y. 2009) (where "defendants engaged in repeated acts of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted under the faithless servant doctrine").[24]

c. *Application of equitable forfeiture.* While acknowledging

[23]See, e.g., *Schwartz* v. *Leonard*, 138 A.D.2d 692, 694 (N.Y. 1988) (single act of disloyalty — lawyer removing files that he had been working on from defendant's office and then starting law practice of his own — not "persistent pattern of disloyalty" and thus did not warrant any forfeiture).

[24]As the parties and the judge acknowledged, Federal courts purporting to apply New York's strict law on forfeiture have expressed some unease about the doctrine's sometimes harsh consequences, and in general have engaged in a more contextual approach to the agent's disloyalty. See, e.g., *Design Strategy, Inc.* v. *Davis*, 469 F.3d 284 (2d Cir. 2006) (disloyal employee who earned both base salary and sales commissions forfeits all salary paid during period of disloyalty but not his commissions earned, because employee's disloyalty did not arise in connection with any commissions to which he was entitled under terms of his employment agreement); *Phansalkar* v. *Andersen, Weinroth & Co.*, 344 F.3d 184, 205 (2d Cir. 2003) (expressing concern that earlier

in her posttrial memorandum that New York law governed forfeiture, and that a faithless servant is "generally disentitled to recover his compensation" under New York law, the judge offered three reasons why she was "not persuaded" that Astra was entitled to the "extreme" remedy of forfeiture of all compensation from the commencement of the period of disloyalty. We conclude that the rationales are not supported in New York forfeiture law.

First, the judge stated that New York forfeiture law requires only that compensation allegedly *due* to the disloyal employee must be forfeited, and not that compensation already paid must be disgorged. We conclude that applicable New York precedent is to the contrary. See, e.g., *Luskin* v. *Seoane*, 226 A.D.2d 1144, 1145 (N.Y. 1996) (disgorgement of "all compensation and expenses that plaintiff paid" to disloyal employee during period of disloyalty); *Maritime Fish Prods., Inc.* v. *World-Wide Fish Prods., Inc.*, 100 A.D.2d 81, 91 (N.Y. 1984) (company "entitled to the *return* of any compensation paid [its employee] during the period of disloyalty"). See also *Aramony* v. *United Way Replacement Benefit Plan*, 191 F.3d 140, 153-154 & n.6 (2d Cir. 1999) (affirming judge's order for disgorgement of all salary during period of disloyalty, limited to seven-year statute of limitations period).[25] In a more recent definitive statement, the Appellate Division found "no merit to [the disloyal employee's]

---

Federal forfeiture holdings were in "tenuous posture" in relation to New York law). See also *G.K. Alan Assoc., Inc.* v. *Lazzari*, 44 A.D.3d 95, 103 (N.Y. 2007), aff'd, 10 N.Y.3d 941 (2008) (noting that Federal courts attempting to predict how Court of Appeals of New York would apply forfeiture have held that faithless servants forfeit only compensation related to transaction in which disloyalty occurs, provided, inter alia, that parties agreed to task-by-task compensation regime), quoting *Phansalkar* v. *Andersen, Weinroth & Co.*, *supra*. Nonetheless, the rulings of the United States Court of Appeals for the Second Circuit on New York forfeiture law adhere to the principle of strict forfeiture of all compensation for the period of disloyalty or the task disloyally performed. Thus, for example, in the *Phansalkar* case, *supra* at 187, the disloyal employee was required to forfeit all compensation earned after the first act of disloyalty, including $4.4 million in stock awarded for services faithfully rendered. In *Sequa Corp.* v. *GBJ Corp.*, 156 F.3d 136, 146-147 (2d Cir. 1998), the disloyal employee was ordered to forfeit $900,000 in compensation for disloyal acts that cost the company approximately $26,000.

[25]To the extent that the statute of limitations may be implicated in a claim of forfeiture, the judge held, and we agree, that Bildman failed to assert this defense and it is waived.

argument that disgorgement of compensation received by a faithless employee should be disallowed as tantamount to the imposition of punitive damages." *Matter of Blumenthal*, 32 A.D.2d 767, 768 (N.Y. 2006). In sum, New York law entitles Astra to sums already paid in compensation to Bildman during the period of his disloyalty.

Second, the judge sought to distinguish Astra's claim for forfeiture on the ground that New York "generally" applies forfeiture only to what she termed "low-level" employees who had diverted corporate opportunities. Again, this is a distinction not supported by New York law. The defendant in *Aramony* v. *United Way Replacement Benefit Plan*, *supra* at 143, 145, was the former president and chief executive officer of a major national charitable corporation who, among other things, improperly used the charity's funds and filed false expense accounts in order to sustain his extravagant lifestyle. The employee in *Matter of Blumenthal*, *supra*, was a former executor who diverted monies from the estate to "himself and his wife and entities with which his wife was affiliated," falsely claiming that they were incentive payments. See also *Maritime Fish Prods., Inc.* v. *World-Wide Fish Prods., Inc.*, *supra* (company vice-president diverted corporate opportunities and set up rival business while in company's employ); *Harry R. Defler Corp.* v. *Kleeman*, 19 A.D.2d 396, 399-401 (N.Y. 1963), aff'd, 19 N.Y.2d 694 (1967) (general manager vice-president misused company's confidential information to set up competing company). Like Bildman, see note 13, *supra*, these defendants were senior executives who used their position for substantial improper personal gain; they were required to forfeit their compensation as a consequence.

Third, and perhaps most significantly, the judge opined that "[r]ules of reason and fairness and the lack of New York Court of Appeals decisions mandating forfeiture in all cases of breach of fiduciary duty suggest that this Court should follow a less strict approach in determining how to impose forfeiture." In other words, the judge reasoned that forfeiture of the entirety of Bildman's compensation for the period of disloyalty was unfair in light of Bildman's substantial services to Astra.[26] Accordingly, the judge looked to Massachusetts equitable principles to

---

[26] Astra does not challenge the judge's posttrial findings on Bildman's substantial contributions to Astra.

fashion the requirement that Astra was entitled to forfeiture of only the amount of compensation determined after an evidentiary hearing to be in excess of the value of Bildman's services to the company.

Reliance on Massachusetts equity law was misplaced.[27] Massachusetts permits a task-by-task apportionment of forfeiture; New York, the State whose law controls here, does not. Compare *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 14 (1983), with *Maritime Fish Prods., Inc.* v. *World-Wide Fish Prods., Inc.*, 100 A.D.2d 81, 91 (N.Y. 1984) (company "entitled to the return of *any* compensation paid [its employee] during the period of disloyalty" [emphasis added]). Under Massachusetts law, the value of the disloyal employee's faithful services is determinative; under New York law, it is irrelevant. Compare *Meehan* v. *Shaughnessy*, 404 Mass. 419, 440 (1989), with *Feiger* v. *Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928-929 (1977) (makes no difference "that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent").[28]

In short, invocation of Massachusetts doctrines of equitable

---

[27]Astra makes no claim of breach of fiduciary duty under the employment agreement, which is governed by Massachusetts law. Its claim for forfeiture is explicitly (and exclusively) based on loyalty principles. In its complaint, Astra requested that the Superior Court, "[p]ursuant to Count II (Breach of Fiduciary Duty), enter judgment for the plaintiff in the full amount determined through the accounting, as well as such other amounts attributable to [Bildman's] breaches of his obligations to the plaintiff." The jury, moreover, found that Bildman had violated his fiduciary duty, not his fiduciary duty under the employment agreement. Finally, it is established that the specific remedy of forfeiture of compensation is a consequence of application of the "faithless servant" doctrine, which is rooted in fiduciary principles. See Annot., Application of "Faithless Servant Doctrine," 24 A.L.R.6th 399, 399 (2007) ("The faithless servant doctrine provides that an employee who violates his or her duty or loyalty of fidelity in the performance of his or her employment duties forfeits the right to compensation therefor").

[28]The judge's rationale for refashioning the forfeiture requirements of New York law relied on *Meehan* v. *Shaughnessy*, 404 Mass. 419, 440 (1989); *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 14 (1983), and similar decisions applying Massachusetts law. See *In re Tri-Star Techs. Co.*, 257 B.R. 629, 637 (Bankr. D. Mass. 2001) (applying Massachusetts law because "the forfeiture remedy is not a penalty but really reimbursement of payment for services not properly performed . . . compensation is often apportioned in relation to services indeed properly performed"); *Anderson Corp.* v. *Blanch*, 340 Mass. 43, 51 (1959); *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378-379

forfeiture to remediate what the judge considered a result contrary to "reason and fairness" was not appropriate where settled precedent of New York law requires forfeiture in the circumstances of this case. Bildman argues that the judge's actions were permissible because, although New York law governs the issue whether an employee committed a breach of his fiduciary duties, Massachusetts remedies may apply if the case is heard in the Commonwealth. To the contrary, to separate the breach and the remedy in this fashion would interfere with New York State's legitimate interest in regulating the affairs of its corporations. See *Harrison v. NetCentric Corp.*, 433 Mass. 465, 470-471 (2001), quoting *Atherton v. Federal Deposit Ins. Corp.*, 519 U.S. 213, 224 (1997) ("To avoid the imposition of 'conflicting demands,' 'only one State should have the authority to regulate a corporation's internal affairs — matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders' "). Such regulation extends to imposing the specific penalties the State deems most likely to deter the corporate misconduct it seeks to discourage. The rule urged by Bildman would permit identical employee breaches of disloyalty to New York corporations to be treated differently based on accidents of geography, an unacceptable result.[29] See *Harrison v. NetCentric Corp., supra.*

Once it was determined that from 1991 to his termination on

---

(1951); and *Lydia E. Pinkham Med. Co. v. Gove*, 303 Mass. 1, 6 (1939). It is evident, however, that Massachusetts forfeiture law is more lenient on the issue of retainable compensation than New York law. See generally Sheridan, Second Circuit Draws Bright Line on Forfeiture of Pay for Disloyalty, N.Y. L.J. Feb. 23, 2004, at 9, col. 1 (contrasting New York's "bright line" rule of forfeiture with more relaxed Massachusetts forfeiture standards).

[29]Bildman also asserts on appeal that the judge had authority under New York principles of equity to reshape the remedy of forfeiture as she did. See N.Y. Civ. Prac. L. & R. §§ 3017, 3215 (McKinney Supp. 2009) ("the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just"). However, Bildman has cited no decision in which a New York appellate court has invoked this equitable authority to relax the New York forfeiture standard that has developed well over one century. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006). Cf. *Shomron v. Fuks*, 286 A.D.2d 587 (N.Y. 2001) (petition to disqualify opposing party's law firm and to order American Arbitration Association to reinstate original arbitrator); *Ungewitter v. Toch*, 31 A.D.2d 583 (N.Y. 1968), aff'd, 26 N.Y.2d 687 (1970) (damage award in lieu of rescission for fraudulent purchase of farm).

June 25, 1996, Bildman, a senior employee, officer, and director, had committed numerous and substantial breaches of his fiduciary duties to Astra, forfeiture was warranted of all of Bildman's compensation for the period of disloyalty, to the extent sought by Astra. See note 20, *supra*; *William Floyd Union Free Sch. Dist.* v. *Wright*, 61 A.D. 3d 856, 859 (N.Y. 2009).[30]

New York's forfeiture law has been described as harsh, as the judge determined it to be. Cf. *Soam Corp.* v. *Trane Co.*, 202 A.D.2d 162, 163 (N.Y. 1994) (plaintiff argued that forfeiture is "unconscionable penalty," but court concluded that this contention was negated by "New York's strict application of the forfeiture doctrine"). For New York, however, the harshness of the remedy is precisely the point. See, e.g., *Matter of Blumenthal*, 32 A.D.2d 767, 768 (N.Y. 2006) ("no merit" to respondent's argument that "disgorgement of compensation received by a faithless employee should be disallowed as tantamount to the imposition of punitive damages," and declining invitation to abolish faithless servant doctrine, "which has long been the law of this State").

5. *Costs of investigation.* The judge refused to permit Astra to argue to the jury that Bildman was liable to the company for the entire $905,080 cost of Winthrop Stimson's investigation of the sexual harassment claims. She then denied Astra's motion for postverdict damages for investigative costs in the same amount. She declined to make the award because, among other things, she viewed it as "excessive" in the circumstances. Astra maintains on appeal that it is entitled to the full $905,080 as the compensatory damage it suffered as a result of Bildman's misconduct, an issue, it argues, that should have gone to the jury.[31]

---

[30]Our conclusions on the issue of forfeiture make it unnecessary to consider at length the judge's findings, after the evidentiary hearing on forfeiture, that Bildman's breaches of duty, although serious, were ancillary to the significant contributions he made to Astra's business. The evidence heard by the jury was overwhelming that from 1991 through 1996, Bildman used Astra as his personal checkbook and his sexual fiefdom, in the process driving away employees, creating a corrosive corporate atmosphere, causing Astra actual loss, and leading to months of bad publicity about the company. We agree with Astra that, as a matter of law, even under the more lenient substantial and pervasive standards of forfeiture, see text accompanying note 23, *supra*, Bildman's breaches of fiduciary duty mandate equitable forfeiture of his compensation during the period of his disloyalty.

[31]On appeal, Bildman counters that the investigative costs are "expressly

The judge did not abuse her discretion in keeping this issue from the jury. The judge noted that the matter of damages for investigative costs "has never squarely been an issue in this case." She reasoned that, given the number of witnesses that would be required to explore the propriety of each item of services rendered by Winthrop Stimson in its sixty-nine page bill, and its costs, the issue would be too confusing and time-consuming for the jury, which had already been sitting for seven weeks.[32] See *Commonwealth* v. *Durning*, 406 Mass. 485, 497 (1990) (within judge's discretion to exclude evidence that, while relevant, presents danger of "confusion, unfair prejudice, or undue consumption of time" that outweighs probative worth of evidence offered).

We are also unpersuaded that Astra has met its burden of proving to the judge its entitlement to $905,080 in investigation costs.[33] See *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.7 (1993). Astra correctly asserts that an employer may be entitled to recover for compensatory costs incurred as a result of a breach of fiduciary duty, including the costs of investigation. See *Aramony* v. *United Way Replacement Benefit Plan*, 191 F.3d 140, 154 (2d Cir. 1999). But the award of damages for investigative costs itself is not an entitlement; the employer must still meet its settled burden of proving that the damages sought were caused by the employee.[34] See *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 18 (1983) (affirming award of specific costs where master found such costs to be "direct

barred" by the employment agreement, which provides in relevant part: "In no event shall the Employee be required to reimburse the Company for any legal fees or expenses incurred by it in connection with this Agreement." We agree with Astra that this theory was not presented before the trial court and is waived. See, e.g., *Matter of Balliro*, 453 Mass. 75, 85 n.9 (2009) (waiver).

[32]On appeal, Astra does not argue before us that it properly framed this issue for the jury.

[33]The parties do not argue whether this issue is decided under Massachusetts or New York law. The case law of both jurisdictions demands the same result. See *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 18 (1983) (defendants' arguments failed because they ignored causation found by master); *Aramony* v. *United Way Replacement Benefit Plan*, 191 F.3d 140, 154 (2d Cir. 1999) (failure to prove causation is fatal to claim for costs of investigation).

[34]To the extent that Astra argues that it was entitled to recoup the investigative costs merely because it was "legally *required* to conduct a prompt and thorough investigation," this assertion again is no substitute for the requirement of proving causation.

consequence of the breaches of fiduciary duty by the defendants"). Here the jury found that Bildman's affirmative and material misrepresentations and improper use of Astra funds was "a substantial factor in causing harm to Astra." However, merely pointing to these findings, as Astra does, does not satisfy the causation requirement for damages related to investigative costs.

Nor does the record permit a finding of the necessary causation. At trial, Bildman established decisively, as the judge subsequently noted, that many of the investigative costs that Astra alleged resulted from Bildman's acts had no direct relationship to Bildman, other than the fact that his own wrongdoing spurred revelations of the wrongdoings of others.[35] Even accepting Astra's argument that Bildman's conduct was a "substantial factor" in its choice to conduct a detailed investigation of circumstances at the company, it is established that the "substantial factor" standard is insufficient to satisfy causation. See, e.g., *L.N.C. Invs., Inc.* v. *First Fid. Bank*, 173 F.3d 454, 465 (2d Cir. 1999), *S.C.*, 308 F.3d 169 (2d Cir. 2002), cert. denied, 538 U.S. 1033 (2003) (rejecting further use of "substantial factor" analysis, in favor of causation analysis, where "damages are sought for breach of fiduciary duty under New York law"). Indeed, the authority cited by Astra to establish in effect its automatic entitlement to the totality of the investigation costs demonstrates the opposite.[36] In the absence of sufficient evidence on causation regarding the full cost of the investigation, we discern no error in the judge's characterization of the request as "excessive."

---

[35]The record establishes, for example, that some of the items enumerated in Winthrop Stimson's bill of its investigation related to sexual harassment of female employees by senior Astra executives other than Bildman, and even by Astra customers. The pervasive sexual harassment resulted in a settlement with the Equal Employment Opportunity Commission (EEOC). Another substantial portion of Winthrop Stimson's bill centered on the EEOC action noted above, which resulted in the entry of a consent decree against Astra. The judge properly characterized the consent decree as focusing on Astra's "own sexual harassment policies and practices, and the underlying case related to the hostile work environment created by several individuals connected with Astra, not Bildman alone." Another portion of the Winthrop Stimson bill was for the settlement of individual actions brought by current or former Astra employees. After the jury's verdict, a Winthrop Stimson attorney testified, the law firm did not allocate its time for different services billed on the same date.

[36]See *Aramony* v. *United Way Replacement Benefit Plan, supra* (rejecting argument for recovery of "one hundred percent" of investigation costs because

Even if Bildman's misconduct was a substantial factor in causing Astra to pay for a wide variety of services, that does not entitle it to recover for services that the judge found to be unrelated to Bildman's misconduct, simply because the same providers rendered the services and they bore some tangential relationship to Bildman's behavior. We affirm the denial of Astra's claim for the totality of its sexual harassment investigative costs.

6. *Bildman's legal fees.* The judge denied Bildman's motion for judgment on his counterclaim for legal fees and costs under the employment agreement, and entered judgment for Astra on the counterclaim. Bildman argues, in essence, that the employment agreement, read as a whole, compels a different result and obligates Astra to pay the legal fees and costs of his defense and counterclaims. Alternatively, he claims that, at a minimum, the employment agreement requires Astra to pay the legal fees and costs he incurred in successfully pressing his claim for compensation under the 1996 supplemental stock grant. The Superior Court judge's ruling on the issue of legal fees and costs is sound, and we will not disturb it.

As noted earlier, the employment agreement is expressly governed by Massachusetts law, and our review is plenary. See *Bank* v. *Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008). We construe the employment agreement, whenever possible, as a workable and harmonious whole, in which each provision has meaning and furthers the parties' intent. See *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 795 (1986), quoting *Charles*

---

employee's "misconduct was a substantial factor as to some portion of them" and affirming proportionate award of costs of investigating defendant's misconduct to extent United Way had "establish[ed] separately the requisite causation as to these distinct services and costs"); *Rubin Quinn Moss Heaney & Patterson, P.C.* v. *Kennel*, 832 F. Supp. 922, 936 (E.D. Pa. 1993) (employer entitled to award of costs of investigation where court specifically found that employer's costs were incurred "[a]s a result of" defendant's breach of fiduciary duty, which "caused" investigatory costs); *Enstar Group, Inc.* v. *Grassgreen*, 812 F. Supp. 1562, 1564, 1568 (M.D. Ala. 1993) (trial evidence "established" that employer incurred investigatory costs because employee "conceal[ed]" facts pertaining to "specific subjects" of investigation and "misrepresent[ed]" his activities). See also *American Fed. Group, Ltd.* v. *Rothenberg*, 136 F.3d 897, 907-908 n.7 (2d Cir. 1998) (less stringent "substantial factor" standard inappropriate where "the remedy sought is damages to compensate for a claimant's loss" because in that context "the usual damages-causation rule for tort and contract breach cases is appropriate").

*I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 501 (1939) (contract must be construed so as to yield "a workable and harmonious means for carrying out and effectuating the intent of the parties"). Our starting point is the language of the employment agreement itself. Here, we are particularly concerned with par. 9 and par. 4 (f), both individually and in concert.

Paragraph 9 of the employment agreement provides, in relevant part, that Astra shall pay to Bildman "all reasonable legal fees and expenses incurred by him in contesting or disputing *any* termination of this Agreement or in seeking to obtain or enforce any right or benefit provided by this Agreement" (emphasis added). Termination is defined by par. 4 (f) to encompass termination by Astra for cause.[37] "Cause" is therein defined as (i) "the willful commission . . . of theft, embezzlement, fraud or other serious and substantial crimes" against Astra; (ii) "other acts or omissions materially evidencing bad faith toward" Astra; (iii) "conviction of . . . any criminal offense involving dishonesty or breach of trust or any felony"; or (iv) "the willful and egregious refusal or failure of [Bildman] to perform his duties at a level of performance reasonably satisfactory to the Board of Directors" continuing for more than sixty days after written notice by the board of such failure. Paragraph 4 (f) further provides that if Bildman's employment is terminated for cause, so defined, Astra "shall have *no further obligation* to [Bildman] hereunder, except any obligation under any compensation or benefit plan in which [Bildman] is then a participant" (emphasis added).

Bildman's interpretation of the employment agreement places foremost emphasis on the word "any" in par. 9. He argues that the parties must have intended to include payment of his legal fees and costs for "any" termination action, including termination for cause, because the only scenario under which Bildman and Astra would likely litigate against each other would be his termination for cause. Fairly read, he argues, the limiting language of par. 4 (f) applies only to Astra's obligations to pay

---

[37]The other circumstances of termination under par. 4 of the employment agreement are death, disability, termination by Bildman without cause, termination by Astra without cause, termination by Bildman for cause, and termination on change of control of Astra. Paragraph 1 of the employment agreement declares that it shall "remain in full force and effect until terminated in accordance with and subject to the provisions of Paragraph 4."

termination benefits to Bildman beyond those he had earned. We are unpersuaded.

Paragraph 4 (f), which limits Astra's "obligation[s]" to Bildman where he has been discharged for cause, is unambiguous, as Bildman concedes. The payment of Bildman's legal fees and costs is a contractual obligation, and the employment agreement does not specify otherwise. The language of par. 4 (f), limiting Astra's obligation to Bildman where he has defrauded or otherwise wronged the company, is conspicuously absent from the other provisions addressing termination of Bildman's employment with Astra. We may reasonably assume, as did the judge, that the parties did not intend to establish as a benefit of Bildman's employment his entitlement to defraud Astra at its own expense. Moreover, in construing the employment agreement to deny Bildman his legal fees and costs, the judge relied on a cardinal principle of contract interpretation under which a more specific contract provision controls a more general provision on the same issue. See *Lembo* v. *Waters*, 1 Mass. App. Ct. 227, 233 (1973), quoting A. Corbin, Contracts § 547, at 176 ("If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former").

We are also unmoved by Bildman's argument that the judge destroyed the benefit of his bargain by erroneously reading a good faith requirement into par. 9, thus making it duplicative of the indemnification provisions of par. 8, which are predicated on good-faith actions.[38] We agree that par. 9, read in conjunction with the termination provisions of par. 4, gives Bildman a

---

[38]Paragraph 8 provides: Astra "agrees to indemnify [Bildman] in his capacity as an officer and member of the Board of Directors of the Company, all to the maximum extent permitted under the laws of the Commonwealth of Massachusetts, from and against any and all claims, damages, suits, costs, or liabilities, arising out of or relating to the performance of his duties and responsibilities as President and Chief Executive officer. The provisions of this Paragraph 8 shall survive expiration or termination of the Agreement for any reason."

The judge held that the indemnification provision of par. 8 was unavailable to Bildman because the jury found that he acted in bad faith, a point that Bildman does not, nor could, contest. See G. L. c. 156B, § 67 (providing, in part, that corporate officers and directors may not be indemnified with respect to

broader entitlement to payment of his legal fees and costs than does par. 8, but there is no evidence to suggest that that greater coverage extends to acts undertaken in bad faith against Astra itself. Rather, the wording of the employment agreement makes clear that, in certain adversary actions between Bildman and Astra that are not covered by the indemnification provisions of par. 8, Astra would be required to pay Bildman's costs of litigation. These adversary actions would include, for example, an action under par. 4 (g) disputing whether a change of corporate control triggering Bildman's termination had occurred, or a dispute arising under par. 4 (a) concerning a continuation of benefits to Bildman's spouse and children on his death. There is no merit to Bildman's claim that the judge's construction of par. 9 renders it hollow.[39]

Nor do we find merit in Bildman's secondary argument that he is entitled to reimbursement from Astra for legal fees and costs related to his "successful" action on the 1996 stock options.[40] See note 20, *supra.* As we have seen, par. 4 (f) of the employment agreement provides that the company shall have "no further obligation" to Bildman if he is terminated for cause except "any obligation under a compensation or benefit plan" in which Bildman participated. Astra issued a "long term management stock plan letter agreement" (letter agreement) in March, 1996, granting Bildman certain shares of stock pursuant to the company's 1993 long-term management stock plan (stock plan). Bildman acknowledged in writing receiving both documents. Neither the

any matter in which they have been adjudicated not to have acted in good faith toward corporation).

[39]The judge held that, even if the award of litigation costs under par. 9 could be construed as unaffected by the limiting provision of par. 4 (f), Bildman's adjudicated acts of bad faith against Astra operated as a material breach of the employment agreement that as a matter of law excused any further obligation of performance by Astra. See *Quintin Vespa Co.* v. *Construction Serv. Co.,* 343 Mass. 547, 554 (1962) (material breach of contract by one party excuses other party from further performance as matter of law). In light of our holding above, we need not address this rationale, other than to note that we find nothing in the language of the employment agreement to support Bildman's claim that it operated to limit Astra's common-law rights under the laws of the Commonwealth. Cf. *Sahli* v. *Bull HN Info. Sys., Inc.,* 437 Mass. 696, 697 n.3 (2002) (release of common-law claims).

[40]The judge's ruling denying Bildman's contractual claim for legal costs and fees does not separately address the stock option controversy, although Bildman did press that separate argument below.

letter agreement nor the stock plan provides for the payment of Bildman's legal fees and costs in a contested action with the company. Thus, neither the employment agreement nor the stock option agreements entitle Bildman to attorney's fees for his dispute with Astra concerning the 1996 supplemental stock grant.

7. *Negligent libel.* Before trial, the judge allowed Astra's motion for summary judgment on Bildman's claims for negligent libel, malicious libel, and libel per se based on various statements published by Astra, Johansson, and Mogren from April 29, 1996, through June 26, 1996.[41] Bildman ascribes error only to the judge's ruling that he was a "limited purpose public figure" and thus unable to sustain a libel claim absent clear and convincing proof of "actual malice," that is, that the statement was made with knowledge of its falsehood or with reckless disregard for whether it was false.[42] See *New York Times* v. *Sullivan,* 376 U.S. 254, 279-280 (1964) (actual malice standard).

[41]We reject Astra's claim that Bildman waived the argument that he was a private person and not a limited purpose public figure because Bildman never asserted on summary judgment that he was a private individual. We agree with Bildman that his argument that he was a private figure was central to his counterclaim for negligent libel.

[42]On summary judgment the judge reviewed several allegedly defamatory statements disseminated to Astra employees, in press releases, via news conferences, and by other means. The judge determined as to most of these statements that they were either true or nondefamatory as a matter of law. As to statements that might lend themselves to negligent libel claims, the judge ruled that Astra was entitled to summary judgment because Bildman, as a limited purpose public figure, would be unable to meet his burden at trial of proving the statements to have been made with actual malice. Bildman does not appeal from the judge's rulings as to malicious libel or libel per se, nor does he argue, as he did below, that summary judgment was improper by reasons of "defamation by conduct," see, e.g., *Alaska Statebank* v. *Fairco,* 674 P.2d 288, 294 (Alaska 1983) (plaintiff's conduct "was clearly defamatory despite the fact that the statement communicated by the repossession [of property] was not actually verbalized"), a theory that, as the judge noted, we have not recognized.

On appeal, Bildman's negligent libel claim focuses on the following statements: (a) a May 3, 1996, article in the Wall Street Journal in which an Astra spokesperson described Bildman as "not forthcoming" to Astra AB about the Business Week investigation; (b) a speech Mogren gave to Astra employees on May 13, 1996, in which he stated, among other things: "[S]ome people have tried to put themselves above the rules, at the same time that they have made great efforts to cover up what has happened"; (c) a June 26, 1996, Astra news release and press release that made identical statements that, as Bildman summarizes on appeal, he "had engaged in inappropriate behavior at company

See also *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (describing limited purpose public figure); *Jones* v. *Taibbi*, 400 Mass. 786, 797-798 (1987) (same). Bildman claims, in essence, that he was a private figure thrust unwittingly into the public spotlight over a "private dispute" in which statements were negligently made that ruined his reputation. See *id.* at 797 (for private persons liability may be imposed "upon proof of negligent publication of a defamatory falsehood"). The judge did not err.

Where facts are undisputed, the status of a libel plaintiff is a question of law for the judge. *Bowman* v. *Heller*, 420 Mass. 517, 522, cert. denied, 516 U.S. 1032 (1995). Here, the judge applied the two-part test of *Gertz* v. *Robert Welch, Inc.*, *supra*, to determine whether Bildman was a limited purpose public figure. See *Bowman* v. *Heller*, *supra* at 524 n.7 ("public controversy" must exist, and "the nature and extent of the individual's participation in the particular controversy" must be determined). The judge first considered whether the allegedly defamatory statements involved a matter of public controversy. See *id.* The judge had little difficulty, as do we, concluding that the issue of widespread sexual harassment at a publicly traded company employing 1,000 people is a matter of general concern. Although Bildman argues that the serious allegations against him "were unlikely to be felt by persons not involved in the controversy," the issue of sexual harassment in the workplace is a focus of a considerable body of State and Federal law and regulation and a matter of frequent and often heated public debate.[43] The topic of Bildman's actions echoed far beyond Astra, its employees, and their families. For many months, it wove its way into the national and international discourse about permissible conduct in the

functions, that he had disregarded company rules and procedures, that he had failed to keep the company apprised, that he had rented outside office space for the purpose of keeping information from the parent company, that he had used company funds for family vacations and that he had used approximately $2 million for personal expenses"; and (d) an Astra statement appearing in the February 5, 1998, Boston Globe that Bildman's "actions — asking people to destroy records and the like — are in our estimation an attempt to cover up and keep things from his superiors in the company."

[43]Although the judge did not identify the dispute between Astra and Bildman as evidencing matters of public concern other than sexual harassment, the parties' dispute might be said to reflect other issues of general interest, such as corporate integrity, corporate governance, and corporate financial controls, among others, all of which have attracted much recent media attention.

workplace and the place and treatment of women in the private sector. See, e.g., Sexual-Harassment Cases Trip Up Foreign Companies: Astra and Mitsubishi Handle Complaints Differently, But Both Hit Pitfalls, Wall St. J., May 9, 1996, at B4.

Second, the judge considered the nature and extent of Bildman's participation in the controversy. See *Bowman* v. *Heller*, *supra* at 523 n.7. Here she found, on the undisputed record, that Bildman was neither a victim nor an unwitting participant in the broad media coverage of his dispute with Astra.[44]

In each instance, Bildman or his counsel denounced Astra in unequivocal terms. "Since the beginning of this case, I and my family have been outraged at the irresponsible allegations that have been made against me," Bildman is quoted as saying in a press release issued by his counsel on June 4, 1996. In a press release of June 26, 1996, Bildman's counsel denounces "the company's allegations of financial wrongdoing by Lars Bildman," "scurrilous and untrue allegations brought by disgruntled former employees," and a " 'star chamber' investigation" by Astra of Bildman.[45] These remarks are fairly typical of Bildman's thrust and parry. His is not a case in which the libel plaintiff is a "bit player" in a media drama created by forces over which he had no control. Bildman played a central role, with "access to the channels of effective communication" that most private individuals do not enjoy. See *Gertz* v. *Robert Welch, Inc.*, *supra* at 344 (noting that private individuals generally do

[44]The judge found that Bildman, through counsel, repeatedly contacted and used the media, including Business Week, the Boston Globe, and the Boston Herald, to comment on the investigation, deny and rebut Astra's allegations, and influence the resolution of the investigation in the public eye. In addition, Bildman sent press releases to various media outlets, including the New York Times, Wall Street Journal, Reuters, United Press, New England Cable News, CBS News, WCVB-TV, WLVI-TV, and WHDH-TV in Boston. Bildman also entered into unsuccessful negotiations with CBS News to be interviewed on its evening news program in New York and appeared in an interview on a Swedish television program.

[45]To the extent that Bildman claims that he acted as a private person because he struck back at Astra only after the company had begun to defame him, it does not pass notice that Bildman began assembling a public relations team in mid-December to influence information disseminated by and to both Business Week and Astra AB, months before Astra AB learned of, much less spoke publicly about, his wrongdoing at the company. We add that the media storm that swept over Bildman originated in his own wrongful conduct as a corporate officer and director beginning years before Business Week began its investigation.

not have same access to media as public figures). It is "readily apparent" to us, as it was to the judge, that Bildman "palpably engineered efforts to project himself into the public limelight." *Tripoli* v. *Boston Herald-Traveler Corp.*, 359 Mass. 150, 156 (1971).

Because the judge correctly concluded that Bildman was a limited purpose public figure in relation to the allegedly defamatory statements, she correctly awarded summary judgment to Astra on his negligent libel claims.

8. *Conclusion.* For the foregoing reasons, we affirm the judgments against Astra on the issues of rescission and costs of investigation, and against Bildman on the issues of attorney's fees and libel. We reverse the judgment denying Astra recovery of compensation it paid to Bildman during the period of his disloyalty — $5,599,097 in salary and $1,180,000 in bonuses. We affirm the jury's verdict awarding Bildman $203,691 in damages related to the supplemental stock grant, because on appeal Astra has waived any claim of forfeiture of that award.

We remand the case to the Superior Court for entry of judgments consistent with this opinion.

*So ordered.*